**2022 IL 126918**


# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____


(Docket No. 126918)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
TRAVIS J. WILLIAMS, Appellee.


*Opinion filed May 19, 2022.*


JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Neville, Michael J. Burke, Overstreet, and Carter concurred in the judgment and opinion.


**OPINION**

¶ 1        The central issue in this case is whether the appellate court erred in finding that the prosecutor's unobjected-to comments about hearsay during rebuttal closing argument were reversible plain error. A jury found defendant Travis Williams guilty of three counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2004)) and three counts of criminal sexual assault (*id.* § 12-

13(a)(3)). The Henry County circuit court entered judgment on the jury's verdict and ultimately sentenced the defendant to mandatory life imprisonment. The appellate court reversed the defendant's convictions and remanded for a new trial. 2020 IL App (3d) 170848. For the following reasons, we reverse the appellate court's judgment and affirm the trial court's judgment.

¶ 2                                    BACKGROUND

¶ 3        On November 30, 2016, the defendant was charged with 10 counts of predatory criminal sexual assault and 5 counts of criminal sexual assault. The alleged victim was his daughter, K.W., and the alleged offenses occurred between January 1, 2004, and January 30, 2005. The defendant was also charged with five counts of predatory criminal sexual assault, five counts of criminal sexual assault, and two counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(b) (West 2004)). The alleged victim was his stepdaughter, H.S., and the alleged offenses occurred between January 1, 2007, and December 31, 2007. In the K.W. case, the State indicated that it would proceed to trial on only two counts for each offense and dismiss the remaining counts. In the H.S. case, the State indicated that it would proceed to trial on only one count of predatory criminal sexual assault and one count of criminal sexual assault and dismiss the remaining counts.

¶ 4        Prior to trial, the State filed a motion to admit evidence of other sex crimes pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code). 725 ILCS 5/115-7.3 (West 2016). The State sought to introduce the testimony of K.W. at H.S.'s trial, and vice versa, as well as the testimony of A.R., K.W.'s younger sister and the defendant's daughter, and L.M., a friend of another of the defendant's daughters, to prove his intent and propensity to commit sex offenses. The State indicated that both K.W. and H.S. would testify about back rubs from the defendant that progressed to sexual contact; A.R. would testify that, when she was in seventh or eighth grade, the defendant touched her vagina; and L.M. would testify that, when she was 15 years old, the defendant had her remove her shirt before he gave her a back rub. After the trial court granted the motion, defense counsel agreed to the joinder of the two cases. The State also filed a motion *in limine* under section 115-7 of the Code (*id.* § 115-7) to prevent the defendant from introducing evidence

of the victims' prior sexual conduct. The defense indicated that it would not be eliciting any such testimony, so the trial court considered the matter resolved.

¶ 5 During *voir dire*, the State listed A.R., L.M., and H.S.'s mother (the defendant's ex-wife Patti) as potential witnesses. At trial, however, the State called only three witnesses: K.W., H.S., and Johanna Hager, an expert.

¶ 6 K.W. testified that she was born on January 31, 1992, and the defendant is her father and "like my best friend." K.W. stated that she and the defendant "still are very close," and she bore him no animosity. K.W. described the "sisterhood" in her extended family. Her parents had another daughter, A.R., a year after K.W. The defendant also had four other daughters with three other women. Among K.W.'s half-sisters are H.S. and O.W. K.W. called A.R. "like my best friend" and O.W. "like my baby." The defendant and Patti, who is the mother of both H.S. and O.W., were married for a time but were divorced in 2012. According to K.W., Patti is "like my second mom."

¶ 7 K.W.'s parents never married, and she lived primarily with her mother until she got older and started "living with both of them." When she was 11 or 12 years old and a sixth-grade student, the defendant broke up with two girlfriends. He was "really upset" about the second break-up, so K.W. and A.R. stayed at his house more often. The defendant asked the girls to sleep with him, and they did so on a mattress on the floor with one girl to either side of him. Around that time, "back rubs" from her father at night became awkward and uncomfortable. She would remove her shirt, because the defendant asked her to do so, and then lie on her stomach. That "didn't feel as weird" as subsequent encounters during which the defendant would "not just rub my back but, like, rub my front too." She could not recall why the back rubs changed to front rubs, but "I just know that he had me, like, 'Why don't I just do your front side.' "

¶ 8 K.W. testified that she did not believe that was okay. On another occasion, the defendant took her hand and moved it over his stomach, and K.W. felt the top of his penis because "he had it out" intentionally. She pretended to sleep. The defendant then removed her shorts, touched outside and inside her "vagina area." He "got on top" of her and had sexual intercourse with her. A month later, the defendant mentioned what had happened to K.W. According to K.W., he said "it was kind of his way of, like, teaching me and his way of showing love."

- 3 -

¶ 9        K.W. testified that she "really only honestly remember[s] the first time pretty well," but only "where it happened" after that. She stated that the defendant had intercourse with her "[a]lmost nightly" wherever he lived, except for a short time when he was between homes. That occurred "pretty much every time the opportunity came," which K.W. estimated was hundreds of times—and somewhere between 25 and 50 times when A.R. was in the same bed. The defendant performed oral sex on her and had her perform oral sex on him. She said that happened "a lot," though some time after the intercourse had started.

¶ 10        Eventually, the defendant met Patti, and she moved into his house with her two daughters, including H.S. Patti worked three jobs, and she was often away from the house. K.W. stated that the defendant had intercourse with her upstairs in the bedroom that he and Patti shared. The intercourse continued until K.W. was 17 or 18 years old. One day, the defendant texted her on a phone that both she and H.S. used and asked her "to go upstairs." K.W. texted him that she "didn't want to do that anymore, and it just stopped."

¶ 11        More than once, K.W. thought that she may have gotten pregnant after intercourse with the defendant, which was always unprotected. He reportedly "kinda just blew it off." Around seventh grade K.W.'s period was late, so she punched her stomach. Her mother arranged for her to get birth control shots when she was a high school sophomore. K.W. testified that she told A.R. about the intercourse, but no one else. She "wasn't very comfortable" with what had happened but "never wanted anything to happen" to the defendant. She added that she still felt the same about him, but she knew that "then I wasn't able to protect anyone, so now I feel like I need to."

¶ 12        In 2016, after a day with O.W., K.W. "just felt something" and "needed to say something" to Patti because she was "worried that something would happen" to O.W. K.W. explained that her concern was that the defendant "might try to do what he did to me and touch her." K.W. testified that she asked Patti if she remembered "what [A.R.] said" years earlier about the defendant having intercourse with K.W. When Patti responded affirmatively, K.W. told her that "it was true, of what happened." Shortly thereafter, K.W. was contacted by police and gave a statement to a detective.

¶ 13    On cross-examination, defense counsel asked K.W. about 2009 when A.R. came forward with "some information" and both the police and the Department of Children and Family Services (DCFS) became involved. K.W. was interviewed at the local child advocacy center. She agreed that she told investigators that "this didn't happen." K.W. offered her rationale:

> "Probably for multiple different reasons, the first being that it wasn't A.R.'s story to tell. She—and my opinion is, she didn't do it for reasons that I feel like I needed to do it now. I also felt that I needed to protect my dad somehow at the time. It just wasn't something that I felt like I really wanted to talk about or really be a part in."

When asked why she did not feel the need to protect A.R., K.W. responded:

> "Because, to me, she did it out of anger. She was forced to move in with my dad, and as a way for her to get out of living with my dad, she was going to tell my secret that I trusted with her, so I was pretty angry with her."

And when asked why she did not come forward with information to help protect H.S. and H.S.'s younger sister, K.W. responded, "Because at that time I felt like if it was all happening to me, then it wasn't going to happen to them, so just if I took it, then nobody else would get hurt."

¶ 14    K.W. testified that she moved to her own apartment after high school graduation but that she continued to visit her father. He was "always there" and "how a dad should be." For a year, however, their relationship was strained. When she was 16 years old, K.W. told her parents that she was a lesbian. When she was 17 or 18 years old, she began dating a woman. According to K.W., the defendant "kinda just told me that bringing my girlfriend at that time was like bringing crack into his house, and we kinda just didn't speak after because he just wasn't—he was against me being gay." The relationship eventually was repaired, but K.W. visited him less than she had before his comment. And he declined all of her invitations to visit the home that she shared with her wife and three children.

¶ 15    On redirect examination by the State, K.W. testified that she never told her wife, A.R., or Patti specifically what the defendant had done, just that he had had intercourse with her. The first person to whom she provided details was a police

detective. When asked why she did not protect H.S., K.W. reiterated that she did not think "it was a danger." K.W. stated that the defendant never asked her to keep the intercourse secret. They were close, so he would simply ask, " 'You're going to protect me, right?' " to which she would answer, " 'Yeah, of course.' " K.W. stated that she pleaded guilty to misdemeanor theft when she was a high school junior. She spent 13 days in jail and received a sentence of probation.

¶ 16    H.S. testified that she was born on August 4, 1996, and the defendant is her former stepfather. The defendant and her mother, Patti, married when H.S. was 10 years old and a fifth-grade student, and they divorced when H.S. was 15 years old and a tenth-grade student. The defendant and Patti bought a house the summer before H.S. started fifth grade. Initially, H.S. had a bedroom upstairs but moved downstairs after a year. H.S. recounted when she started to feel uncomfortable with the defendant:

> "The first thing I remember is, it started out with back rubs, and then it kind of moved into more. I don't recall any touching anywhere other than my bedroom, but the back rubs were kind of like—sometimes it would be in the living room, and, you know, it was kind of just a nonchalant thing, but then sometimes it was for—from the living room to my bedroom, and then it became something more than that."

¶ 17    H.S. stated that the back rubs were initially "fine" and "normal." She explained that "we would give my mom a back rub because her back hurt, so that was kind of our way to, like, hey, if we give you a back rub, could we get out of a chore." When the defendant asked, "it was kind of like ***, because we had been giving our mom a back rub, we didn't really think it was that big of a deal." The defendant then asked H.S. to use lotion, and she "thought that was a little strange" and "got a little put off."

¶ 18    H.S. remembered the defendant coming into her bedroom and asking for a back rub, and she remembered "him making me touch him, touch his penis. I remember trying to tell him no, trying to pull my hand away, and nothing worked. I remember him keeping my hand on his penis, helping him masturbate" and ultimately ejaculate. H.S. did not know what that was—she "just knew, you know, a warm, white, sticky substance would come out." H.S. stated, "I wasn't able to pull my hand away" and "I wasn't able to stop it." According to H.S., the defendant was

wearing shorts, which were pulled down just enough to expose his penis. The prosecutor asked H.S. if the defendant said anything, and H.S. responded, "The only one thing that I recall is that he asked if I thought his penis was big, and at that point I was in middle school, and I told him I don't know." The touching happened on "multiple occasions" while H.S.'s younger sister was sleeping and Patti was working. H.S. testified that the touching ultimately escalated from H.S. touching the defendant's penis to the defendant touching outside and inside her vagina:

> "[A]fter I had been forced to touch him, he had started touching me after, on different occasions. I remember on different occasions, where he was touching me, he asked me if it felt good, and I remember telling him no, that it hurt, and he said that it's supposed to feel good."

¶ 19   In 2009, H.S. spoke to a DCFS investigator. She did not tell the investigator about the touching and testified about her decision:

> "I had been convinced that if I told, I would break up a happy family and that my mom would be unhappy because they couldn't be together anymore and that he would be in big trouble, so therefore I told them no.
>
> ***
>
> He told me that if I said yes, he would be in trouble and my mom and him wouldn't be able to be together, and my mom would be very unhappy and very lonely."

After the DCFS investigation closed, the defendant did not attempt to touch H.S. again.

¶ 20   In 2016, years after she graduated high school, she had a telephone conversation with Patti. Patti called to ask H.S. "what was going on, if, you know, I had been touched" by the defendant. H.S. said yes "for the concern of my younger sisters." H.S. added, "I didn't really have intention of telling her, but when she asked me, I figured it had been long enough, and I told her that it had happened when I was in middle school." H.S. testified that she told Patti "the time frame about when everything happened" but did not get "into detail at that point." Patti called the police, and H.S. made a statement to an officer. She also had a more in-depth interview at the local courthouse.

¶ 21 On cross-examination by defense counsel, H.S. testified, "The first time I was asked, I couldn't really remember specifics, and I couldn't really put a number on how many times." She believed that the touching began when she was in seventh grade and ended when she was in eighth grade because she did not remember "much happening in high school." H.S. stated that Patti asked her about the touching around the time of the DCFS investigation and that H.S. said nothing had happened. In 2012, Patti and the defendant divorced, and he moved out of the house. Patti was awarded custody of O.W., who would visit the defendant on weekends. H.S. did not come forward about the touching after the divorce "[b]ecause part of me thought that nothing would happen to O.W. because she's young enough, and with me growing up without a dad, I didn't want to see her grow up without her dad." H.S. also did not come forward about the touching when the defendant and Patti attempted to reconcile because "[O.W.] was still young, and I thought maybe it only happened to me because I wasn't his actual daughter. I thought maybe it's just because I was his stepdaughter, that maybe it's only happening to me, maybe it won't happen to her." H.S. and K.W.'s wife worked at Patti's "vapor shop."

¶ 22 On redirect examination by the prosecutor, H.S. testified that she could not recall how many times that touching occurred, but the defendant touched her vagina "probably at least two times that I specifically remember" and the defendant had her touch his penis "probably at least five times that I can specifically remember." H.S. never discussed the touching with K.W., and H.S. "didn't actually know that anything had happened to [K.W.] until after my mom had called me and asked if anything had happened to me. After that conversation, after that night, I found out that things had also happened to [K.W.]"

¶ 23 Hager testified that she is a forensic interviewer at the Braveheart Children's Advocacy Center, and the trial court certified her as an expert witness. She acknowledged that she did not interview K.W. or H.S.

¶ 24 Hager stated that the phrase "delayed disclosure" means that, "instead of the child going to someone as soon as something has happened to them, there may be days, years, before they disclose what happened." In Hager's opinion, delayed disclosure is "very common," and "most children who have experienced sexual abuse go to their grave without ever telling anyone." Hager clarified:

"Children are much more likely to disclose right away when it's not a family member. They are much more likely to keep it to themselves forever or for years if it is a family member because of their feelings for them."

She added that children strive to appear normal:

"If a child isn't ready to talk about what's happened to them, they do everything they can to move on with their life, to make everything seem as normal as possible, not only for the people in their family and with their friends, but also for themselves. They can keep that locked away as long as no one suspects anything different of them."

According to Hager, a lengthy delay and a sudden disclosure may be attributable to "some external event" or "some other concern in that person's life," including concern for a younger sibling.

¶ 25    On cross-examination by defense counsel, Hager agreed that there has been an occasion in her 1500 interviews when a child provided false information. She agreed that sometimes parents tell their children to lie and that they may do so to gain an advantage in a divorce.

¶ 26    The prosecution then rested its case, and the defense made a directed verdict motion, which the trial court denied. The defense presented no evidence and rested its case.

¶ 27    During closing arguments, defense counsel reminded the jury that the State bears the burden to prove the defendant guilty beyond a reasonable doubt. Defense counsel characterized the testimony from K.W. and H.S. as "uncorroborated," in that

"they came in here and they told you these things happened and you haven't heard any other evidence other than what these two told you to support that. *** You don't have any physical evidence. You don't have any corroborative evidence in the form of—I will give you an example: [K.W.] said that this happened while her sister was in bed with her, that her dad after [his girlfriend] left him, that he pulled a mattress on the floor and he started having the two girls sleep with him. [A.R.] on one side and [K.W.] on one side, Dad in the middle. It would have been really easy to call [A.R.] and say did that, in fact,

happen. But you haven't heard that. The only person's word you have for that is [K.W.'s] word. That's it. And think about that. The State has the burden of proof, and that's one of the easiest things they could have done. \*\*\* They could have put [A.R.] on the stand and they could have said, [A.R.], do you remember when [the defendant's girlfriend] left \*\*\*. \*\*\* Do you remember when she left? Do you remember your dad pulling the mattress on the floor into his bedroom in the house and do you remember [you] and your sister sleeping together with him? Do you remember that? Yes or no? You haven't even heard that that happened from any other witness other than [K.W.] and it would have been so easy for the State to bring that person in and to corroborate [K.W.'s] testimony and they didn't do it."

¶ 28        Defense counsel later returned to A.R., stating, "We don't know what [A.R.] saw or what [A.R.] heard because [A.R.] hasn't been called as a witness." Defense counsel continued: "[K.W.] told [A.R.] about the abuse before [A.R.] made the complaint in 2009. Wouldn't that have been nice to have heard? Call [A.R.] to the stand. [A.R.], did she tell you about this back in 2009?" Defense counsel suggested that any argument that K.W. fabricated her testimony to give Patti an advantage in the child custody dispute for O.W. would be "kind of out of the water if back in 2009 [A.R.] says, well, yeah, my sister did tell me that, but you have not heard from [A.R.], so you don't know." Defense counsel then turned to K.W.'s wife: "She told her wife \*\*\* about the abuse. It is unclear when or where she told her wife about the abuse, but she very much said that she told her wife about the abuse. Same argument. Put [K.W.'s] wife on the stand."

¶ 29        During rebuttal argument, the prosecutor responded to defense counsel's argument about A.R.: "He makes a point of saying, well, why didn't they call [A.R.] as a witness? Well, first of all, the defense has subpoena powers just like the government." Defense counsel objected, and an exchange took place in chambers:

>       "THE COURT: Okay. The record will show we are in chambers out of the presence of the jury for an objection. So counsel?

>       DEFENSE COUNSEL: It's my objection, so I will have to state it. We have no burden of proof. We don't have to call witnesses. They can't argue during closing argument that we can do this. It's their burden.

THE COURT: Response?

PROSECUTOR: There is current case law saying that when the defendant opens the door and makes comments that the State didn't call witnesses, we are allowed to respond.

THE COURT: Anything further?

DEFENSE COUNSEL: She's probably way more familiar on the current case law than I am, so I don't have anything further.

PROSECUTOR: I will certainly specify to the jury that I'm not indicating they have the burden of proof, but when he makes a statement that I could have called X people, he can too. He has subpoena powers."

The trial court overruled the objection.

¶ 30    Back before the jury, the prosecutor stated:

"The defendant has subpoena powers just like the State and I will note to you that I am not implying that the defendant has any kind of burden in this case. I fully accept the fact that we have the burden to prove this case beyond a reasonable doubt. But when the defendant stands here and tells you we could have subpoenaed and makes it sound like we are the only ones that can get people here, they have the right and the ability to subpoena anybody they choose to subpoena, also.

In regards to telling [A.R.]—and we should have subpoenaed [A.R.] to come say what [K.W.] told her, many of you will be familiar with hearsay, which is something that's said outside of court. It's a rule we can't bring in hearsay, so for the defense to suggest to you that I should call [A.R.] to talk about what [K.W.] told her, he knows I can't do that.

In regards to [K.W.'s] wife in that *** [K.W.] told her what happened when they got married, again, hearsay. I can't do that. So what he's suggesting that I do, he knows very well that I can't."

Defense counsel did not object.

¶ 31 Following closing arguments, the trial court gave the jury instructions, including one on the burden of proof, but did not explain the hearsay rule or its exceptions. After slightly more than three hours, the jury reached verdicts on the six charges, finding the defendant guilty of three counts of predatory criminal sexual assault of a child and three counts of criminal sexual assault. The defendant filed a motion for a new trial, contending that there was insufficient evidence of his guilt and that the court erred in allowing the State to argue in rebuttal that the defendant could have called witnesses to testify. The trial court denied the motion and sentenced the defendant to three mandatory life sentences for the predatory criminal sexual assault charges and five years for each of the criminal sexual assault convictions.

¶ 32 A divided panel of the appellate court reversed. 2020 IL App (3d) 170848. The appellate court majority held that the trial court did not abuse its discretion in overruling defense counsel's objection to the prosecutor's comment that the defendant also had subpoena powers. *Id.* ¶ 17. The majority then considered the defendant's contention that the prosecutor misstated the law when she argued that the hearsay rule prevented it from calling K.W.'s wife and A.R. as witnesses and argued that defense counsel knew the testimony was barred by the hearsay rule. *Id.* ¶ 18. Because defense counsel did not object to those comments, the majority turned to the plain-error doctrine. *Id.*

¶ 33 The appellate court majority recognized that the first step in the plain-error analysis is determining if a clear or obvious error occurred. *Id.* (citing *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). Here, the prosecutor informed the jury that hearsay was " 'something that's said outside of court,' " a statement that the appellate court majority called, "at best, incomplete." *Id.* ¶ 19. According to the majority, the hearsay rule generally prohibits as evidence an out-of-court statement that is offered to prove the truth of the matter asserted, but there are exceptions to that rule that may have been applicable in this case. *Id.* The majority concluded that the State committed a clear error when it misstated the law regarding hearsay and then compounded that error by implying that that was why the witnesses were not called. *Id.* ¶ 20 (citing *People v. Shief*, 312 Ill. App. 3d 673, 679 (2000)).

¶ 34 The appellate court majority then turned to the two prongs of the plain-error doctrine, specifically the first prong, under which a reviewing court will reverse a

- 12 -

criminal defendant's conviction and remand for a new trial when there is a clear error and the evidence is closely balanced. *Id.* ¶ 21 (citing *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005)). In making such a determination, a reviewing court " 'must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case.' " *Id.* (quoting *People v. Sebby*, 2017 IL 119445, ¶ 53). The majority observed that "courts often find the credibility contest to be closely balanced" when "the only evidence consists of two differing accounts of the same event, with no corroborating evidence." *Id.* (citing *People v. Naylor*, 229 Ill. 2d 584, 608 (2008)).

¶ 35        The appellate court majority reasoned:

"Although the testimony of K.W. and H.S. contained some similarities, they testified regarding events that occurred during different time frames. The credibility of both K.W. and H.S. was challenged in that the defense elicited testimony that both had denied that the abuse occurred when they were questioned in 2009. There was no physical evidence, no third party testimony even putting the defendant alone with K.W. or H.S., and no evidence suggesting the defendant's consciousness of guilt. [Citation.] Thus, we find that the case involved a credibility contest between K.W. and the defendant and H.S. and the defendant." *Id.*

Because it viewed the evidence as closely balanced, the majority remanded for a new trial. *Id.* ¶¶ 21-22.

¶ 36        Justice Schmidt dissented, insisting that the evidence was not closely balanced. *Id.* ¶ 27 (Schmidt, J., dissenting). Justice Schmidt considered the evidence against the defendant "overwhelming" and challenged the majority's reasoning:

"The majority finds the evidence closely balanced because of a 'credibility contest.' [Citation.] What credibility contest? Not one witness contradicted the victims' testimony. *** Here, there is no competing version of events, as defendant did not testify nor did he call any witnesses. A qualitative, commonsense evaluation of the totality of the evidence shows that the evidence is not closely balanced." *Id.* ¶ 30.

¶ 37    This court allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021).

¶ 38                                    ANALYSIS

¶ 39    The State argues that the appellate court erred in concluding that unobjected-to comments about hearsay by the prosecutor were reversible plain error. Though the defendant has not requested cross-relief, he argues "preliminarily" that the appellate court erred in concluding that objected-to comments about the defense's subpoena powers were not reversible error. Both issues concern prosecutorial closing argument. Before addressing either, we must briefly discuss the nature of closing argument.

¶ 40    The purpose of closing arguments is to provide the parties with a final opportunity before the jury to review the admitted evidence, to explain the relevant law, and to assert why the evidence and the law compel a favorable verdict. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005) (citing Thomas A. Mauet & Warren D. Wolfson, Trial Evidence 439 (2d ed. 2001)). An error in closing argument is not a typical trial error in that it does not involve the admission of inculpatory evidence or the rejection of exculpatory evidence but rather commentary on the evidence that has been presented. That is why juries are told that closing arguments are not evidence and "any statement or argument made by the attorneys which is not based on the evidence should be disregarded." Illinois Pattern Jury Instructions, Criminal, No. 1.03 (2011) (hereinafter IPI Criminal No. 1.03).

¶ 41    Because an error in closing argument is *sui generis*, we have created a unique two-step process for determining whether a trial court's decision to overrule a defendant's objection to a prosecutorial comment in closing argument is reversible error. A reviewing court must initially determine whether the comment was improper. If so, the court must then determine whether the improper comment was so prejudicial that real justice was denied or the verdict resulted from the error. See *People v. Runge*, 234 Ill. 2d 68, 142 (2009). A trial court's decision to overrule an objection to a comment in prosecutorial closing argument will not be overturned absent an abuse of discretion. *People v. Blue*, 189 Ill. 2d 99, 128 (2000). We now address the prosecutor's comments in this case.

¶ 42                                    Subpoena Powers

¶ 43        During rebuttal closing argument, the prosecutor stated "the defense has subpoena powers just like the government." The defendant argues that the appellate court erred in concluding that the trial court did not abuse its discretion in overruling his objection to that comment. The defendant insists that the comment improperly shifted the burden of proof and that the comment was not invited by defense counsel's closing argument. The defendant maintains that A.R., Patti, and K.W.'s wife were not "equally accessible" to the defense due to their family ties with the victims. We reject the defendant's argument.

¶ 44        Certainly, "a criminal defendant has no duty to produce evidence at trial, and the State may never shift its burden of proof to a defendant." *People v. Mudd*, 2022 IL 126830, ¶ 34. A prosecutor still has wide latitude in making a closing argument and may comment on the evidence and any reasonable inferences that arise from it, even if those inferences reflect negatively on the defendant. See *Runge*, 234 Ill. 2d at 142 (citing *People v. Perry*, 224 Ill. 2d 312, 347 (2007)). Additionally, a prosecutor may comment on matters implicated by defense counsel. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009) ("Statements will not be held improper if they were provoked or invited by the defense counsel's argument." (citing *People v. Kirchner*, 194 Ill. 2d 502, 553 (2000))). Such comments should be considered in the context of the entire closing argument, as well as the trial court's instructions that arguments are not evidence, that the State bears the burden of proving the defendant's guilt beyond a reasonable doubt, and that the defendant need not present any evidence. *Runge*, 234 Ill. 2d at 142-43 (2009); *People v. Ceja*, 204 Ill. 2d 332, 357 (2003) ("Comments in closing argument must be considered in context of the entire closing argument of both the State and the defendant." (citing *People v. Cloutier*, 156 Ill. 2d 483, 507 (1993))).

¶ 45        Here, the prosecutor's comment on the defense's subpoena powers was not improper. The statement was an accurate and reasonable response to defense counsel's claim that the State should have called A.R. and K.W.'s wife as witnesses. See *People v. Kliner*, 185 Ill. 2d 81, 153 (1998); *People v. Jackson*, 399 Ill. App. 3d 314, 319 (2010) (stating that "[w]hile the prosecution is generally not permitted to comment on a defendant's failure to produce evidence, such comments are not improper after a defendant with equal access to that evidence assails the

- 15 -

prosecution's failure to produce it"); *cf. Mudd*, 2022 IL 126830, ¶ 30 (noting that, under Illinois Supreme Court Rule 412(e)(ii) (eff. Mar. 1, 2001), "both sides in a criminal proceeding possess the same ability to request forensic testing of the evidence"). Additionally, the comment was not substantially prejudicial. It was brief, constituting a mere 3 lines in nearly 17 pages of the trial transcript. After the defendant's objection was overruled, the prosecutor reminded the jury that the State has the burden of proof beyond a reasonable doubt. The trial court later echoed that proposition in its jury instructions, adding that the defendant is not required to prove his innocence. See IPI Criminal No. 2.03. The court also advised the jury that closing arguments are not evidence. See IPI Criminal No. 1.03. We cannot say that the trial court abused its discretion in overruling the defendant's objection to the prosecutor's comment about the defense's subpoena powers.

¶ 46                                    Hearsay

¶ 47        During rebuttal closing argument, the prosecutor stated that hearsay is "something that's said outside of court" and "[i]t's a rule we can't bring in hearsay" and that defense counsel was aware of that rule. The defendant did not object to that comment. The State argues that the appellate court erred in concluding that the comment was plain error, necessitating reversal of the defendant's convictions and remand for a new trial.

¶ 48        To preserve a purported error for appellate review, a defendant must object to the error at trial and raise the error in a posttrial motion. *Sebby*, 2017 IL 119445, ¶ 48 (citing *People v. Belknap*, 2014 IL 117094, ¶ 66); see generally *People v. Enoch*, 122 Ill. 2d 176 (1988); *People v. Ford*, 19 Ill. 2d 466, 478-79 (1960) ("An accused may not sit idly by and allow irregular proceedings to occur without objection and afterwards seek to reverse his conviction by reason of those same irregularities."). Failure to do either results in forfeiture of such review, but the forfeiture may be excused when the error is "plain." *Sebby*, 2017 IL 119445, ¶ 48. Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) memorializes the plain-error doctrine:

        "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting

substantial rights may be noticed although they were not brought to the attention of the trial court."

The plain-error doctrine does not create a "general saving clause" to allow defendants to escape the consequences of their nonfeasance. *Herron*, 215 Ill. 2d at 177. Instead, it offers a narrow exception to the rule of procedural default for unpreserved errors. *People v. Jackson*, 2020 IL 124112, ¶ 81. Whether there is plain error is a question of law, which we review *de novo*. *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009).

¶ 49　　As the State correctly observes, the defendant cannot obtain relief on an unpreserved error under the plain-error doctrine if he would not have been entitled to relief on the same error if preserved. Necessarily, then, the threshold inquiry is whether there was an error at all. *Jackson*, 2020 IL 124112, ¶ 81 (citing *People v. Hood*, 2016 IL 118581, ¶ 18). We have used different modifiers for the term "error," but the most common has become "clear or obvious." *Piatkowski*, 225 Ill. 2d at 565. Thus, we must decide whether the prosecutor's comment about hearsay was a clear and obvious error. That requires a "substantive look" at the issue (internal quotation marks omitted) (*Naylor*, 229 Ill. 2d at 593) under the standard for evaluating prosecution comments that we have already discussed. *Jackson*, 2020 IL 124112, ¶ 83. To recap: A prosecutorial comment in closing argument must be improper and substantially prejudicial. If it fails to meet either description, it is not reversible error.

¶ 50　　The State concedes that the prosecutor's explanation of hearsay was "incomplete" but insists that it was "at the very least consistent with the hearsay rule" and, consequently, not clearly and obviously improper. The State points to the prosecutor's reasonable belief that testimony from A.R. and K.W.'s wife would have been inadmissible as prior consistent statements meant to bolster K.W.'s testimony. The State further contends that defense counsel invited the prosecutor's remarks by focusing on the lack of corroboration for K.W.'s testimony. The prosecutor did not ask the jury to speculate about what A.R. and K.W.'s wife would have said or insinuate that their testimony would have helped to establish the defendant's guilt. According to the State, the prosecutor made a "passing comment," which, even if it was improper, was not so prejudicial that it led to the jury's verdict.

¶ 51    The defendant responds by calling the prosecutor's hearsay definition a "mischaracterization" that was "completely improper." The defendant asserts that the prosecutor not only gave an improper definition of hearsay but also "doubled down" on it by stating that defense counsel knew that the rule precluded testimony from A.R. and K.W.'s wife. The defendant opines that that testimony may have been admissible under an exception to the hearsay rule for prior consistent statements made to rebut a charge of recent fabrication or a motive to lie. See *People v. Cuadrado*, 214 Ill. 2d 79, 90 (2005). The defendant parrots the appellate court's reliance on *People v. Emerson*, 97 Ill. 2d 487 (1983), and *Shief*, 312 Ill. App. 3d 673, arguing that the prosecutor's comment implied that there was evidence of the defendant's guilt that could not be offered because of defense tactics. The defendant insists that the comment was not brief and isolated, but the entire explanation for the State's failure to call critical witnesses.

¶ 52    We agree with the State that the prosecutor's summary of the hearsay rule was not improper. Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted. *People v. Moss*, 205 Ill. 2d 139, 159 (2001). The prosecutor told the jury that hearsay is "something that's said outside of court" that the State "can't bring" as evidence. Though that definition is truncated, it captures the core of the rule and the bar to prior consistent statements. See *People v. Williams*, 147 Ill. 2d 173, 227 (1991). The defendant would have us require that a prosecutor must elucidate the jury on when an out-of-court statement is offered for its truth, as well as instances when such a statement escapes the general rule of inadmissibility, every time hearsay is mentioned in closing. We decline to do so.

¶ 53    Further, a prosecutor may offer a response to comments by defense counsel that clearly warrant one, and such a response should be considered in the context of both parties' closing arguments. *Kliner*, 185 Ill. 2d at 154. Here, the prosecutor's comment was invited by defense counsel when he repeatedly stressed that calling A.R. to the witness stand would have been "really easy" and "one of the easiest things" for the State. Defense counsel included K.W.'s wife in that "[s]ame argument." The prosecutor briefly stated why she could not call either witness but also reminded the jury that the State bore the burden of proof. And, as we have noted, the trial court instructed the jury on the burden of proof, the presumption of innocence, and the familiar principle that evidence trumps argument.

¶ 54    Moreover, the prosecutor's comment was not prejudicial. In *People v. Henderson*, 142 Ill. 2d 258, 323 (1990), we noted that the legal standard "applied to arguments by counsel" and the standard "used in deciding if a plain error was made" are "similar." Accord *Jackson*, 2020 IL 124112, ¶ 83 (citing *People v. Nieves*, 193 Ill. 2d 513, 533 (2000)). Our statement was perhaps an oversimplification. The standards governing whether an objected-to, improper comment in closing argument by the prosecution constitutes reversible error and whether an unobjected-to, improper comment in closing argument by the prosecution constitutes reversible plain error remain distinct. Comments in the former category are judged for whether they caused "substantial prejudice," such that a reviewing court cannot determine whether the verdict resulted from them. See *People v. Macri*, 185 Ill. 2d 1, 62 (1998) (holding that "a prosecutor's comments in closing argument will result in reversible error only when they engender 'substantial prejudice' against the defendant to the extent that it is impossible to determine whether the verdict of the jury was caused by the comments or the evidence"); see also *People v. Redd*, 173 Ill. 2d 1, 30 (1996) (equating substantial prejudice with denial of a fair trial). Comments in the latter category are judged for whether they affected "substantial rights." See Ill. S. Ct. R. 615(a). Those concepts—substantial prejudice and substantial rights—are not unrelated, however.

¶ 55    The familiar "disjunctive approach" to plain error is shorthand for a much longer discussion that stems from Rule 615(a). See *People v. Keene*, 169 Ill. 2d 1, 17-18 (1995). Under that rule, a plain error affecting a substantial right is an error that may have deprived the defendant of a fair trial. See *Herron*, 215 Ill. 2d at 177 (stating that "plain error, while a nonconstitutional doctrine, has roots in the same soil as due process" and "[f]airness *** is the foundation of our plain-error jurisprudence"). A fair trial is not an error-free trial. *Id.* (citing *People v. Bull*, 185 Ill. 2d 179, 214 (1998)). Consequently, the plain-error doctrine allows a reviewing court to consider a forfeited, but still clear and obvious, error in two limited circumstances: (1) where the defendant's conviction may have resulted from the error, not the evidence, or (2) where the defendant's conviction resulted from a flawed process, despite the evidence. *Id.* at 177-78 (citing *People v. Baynes*, 88 Ill. 2d 225, 231 (1981)); see also *People v. Stavrakas*, 335 Ill. 570, 583 (1929) ("It is not the practice of this court to reverse a judgment because some error may have been committed by the trial court, unless it appears that real justice has been denied

thereby or that the verdict of the jury or the judgment of the court may have resulted from such error."). Stated differently, the plain-error doctrine applies in cases involving "prejudicial errors—errors that may have affected the outcome in a closely balanced case" or in cases involving "presumptively prejudicial errors— errors that may not have affected the outcome, but must still be remedied." *Herron*, 215 Ill. 2d at 185. Those two prongs do not offer "two divergent interpretations of plain error, but instead two different ways to ensure the same thing—namely, a fair trial." *Id.* at 179.

¶ 56     The appellate court majority declined to reach the second, presumptively-prejudicial-error prong (2020 IL App (3d) 170848, ¶ 21), and the defendant does not suggest that it applies. Indeed, comments in prosecutorial closing arguments will rarely constitute second-prong plain error because the vast majority of such comments generally do not undermine basic protections afforded to criminal defendants. See *People v. Moon*, 2022 IL 125959, ¶ 29 (citing *Neder v. United States*, 527 U.S. 1, 8-9 (1999)).

¶ 57     Under the first prong of the plain-error doctrine, the defendant must show clear or obvious error "where the evidence *** is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence." *Herron*, 215 Ill. 2d at 178. Though there is no additional substantiality requirement because all plain errors are substantial (see *Sebby*, 2017 IL 119445, ¶ 69 (citing Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967))), first-prong plain error must still be prejudicial. In this context, the prosecutor's comment must have had some probable bearing on the result (see *Herron*, 215 Ill. 2d at 193), regardless of how the defendant challenges the comment on appeal. The prosecutor's comment—whether it is preserved and attacked directly or it is unpreserved and attacked indirectly via the alternative contentions of plain error and ineffective assistance—must have been damaging enough that it "severely threatened to tip the scales of justice" against the defendant. *Id.* at 187; see *People v. White*, 2011 IL 109689, ¶ 133 (likening the ineffective assistance standard with the first-prong, plain-error standard).

¶ 58     The severity of that threat depends on the strength of the evidence presented at trial. Simply put, a comment in closing argument cannot "cause substantial injustice" and "effectively deprive defendant of a fair trial" when the evidence is not closely balanced. *Henderson*, 142 Ill. 2d at 322-23. To determine whether the

evidence was, in fact, closely balanced, a reviewing court must review the entire record and conduct a "qualitative, commonsense assessment" of any evidence regarding the elements of the charged offense or offenses, as well as any evidence regarding the witnesses' credibility. *Sebby*, 2017 IL 119445, ¶ 53.

¶ 59 The defendant was charged with predatory criminal sexual assault under section 12-14.1(a)(1) of the Criminal Code of 1961. 720 ILCS 5/12-14.1(a)(1) (West 2004) (now codified at 720 ILCS 5/11-1.40(a)(1)). That statute required the State to prove that the defendant was over 17 years old and committed "an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused, or an act of sexual penetration," and that the victim was under 13 years old. The defendant was also charged with criminal sexual assault under section 12-13(a)(3) of the Criminal Code of 1961. *Id.* § 12-13(a)(3) (now codified at 720 ILCS 5/11-1.20(a)(3)). That statute required the State to prove that the defendant committed "an act of sexual penetration" with a family member under 18 years old. *Id.* The State presented ample evidence regarding those elements.

¶ 60 The appellate court majority, nonetheless, held that the evidence was closely balanced due to a perceived "credibility contest" between the victims, K.W. and H.S., and the defendant. 2020 IL App (3d) 170848, ¶ 21. As support, the appellate court majority relied upon *Naylor*, but that case is inapposite. In *Naylor*, the evidence consisted of two different accounts—one from the arresting officers and one from the defendant—of the same event, neither of which was corroborated by extrinsic evidence, but both of which were credible. *Naylor*, 229 Ill. 2d at 607-08. We characterized the case as "a contest of credibility" and ultimately found that the evidence was closely balanced. *Id.* at 606-07.

¶ 61 Here, there were not two different accounts. There were only the victims' accounts. The defendant was under no obligation to testify, but his decision not to do so, along with the lack of any other evidence in his favor, forecloses any reliance on *Naylor*. However, we must still consider his argument that the evidence was closely balanced. *Piatkowski*, 225 Ill. 2d at 567 (holding that the defendant's choice to present "no evidence whatsoever" was "not fatal" to a first-prong, plain-error argument).

¶ 62     The State and the defendant both address the victims' initial denials to DCFS in 2009 and their later disclosures in 2016. According to the State, their explanations were supported by Hager's testimony. The State notes that Illinois caselaw has recognized reasons for delayed disclosure by child victims of sexual assault. See *People v. Priola*, 203 Ill. App. 3d 401, 414 (1990) ("the failure of a young sexual assault victim to make a prompt complaint is easily understandable because of the natural sense of shame, fear, revulsion, and embarrassment felt by children under such circumstances"). And, though K.W. and H.S. never discussed the defendant's conduct with each other when they were young, they both described similar, escalating patterns of abuse that began with back rubs around the ages of 11 or 12 and ended in sexual contact. The State maintains that the lack of corroborating physical evidence does not make the testimonial evidence closely balanced. See *People v. Shum*, 117 Ill. 2d 317, 356 (1987). The State adds that there was testimony from both K.W. and H.S. as to the defendant's consciousness of guilt.

¶ 63     According to the defendant, K.W. and H.S. were "severely compromised" due to their 2009 denials. Further, the defendant remarks that there was "no confession, no third party witnesses, no medical evidence, no corroboration." Like defense counsel in closing arguments, the defendant pins the lack of corroboration on the State's choice not to call A.R., K.W.'s wife, or Patti as trial witnesses. The defendant maintains that this case hinged solely on the credibility of the victims.

¶ 64     After reviewing the record and conducting a qualitative and commonsense assessment of the evidence, we conclude that the evidence was not closely balanced. The victims' testimony naturally differed in some respects due to their ages, but it was consistent in important details. And their explanations for their 2009 denials and their 2016 disclosures were reasonable and understandable in light of Hager's testimony. The defendant's arguments amount to little more than an attempt to relitigate his trial. We do not believe that the result of that trial was affected by the prosecutor's comment.

¶ 65     In summary, the prosecutor's comment about hearsay was not improper, so it did not constitute a clear and obvious error. Additionally, the evidence against the defendant was not closely balanced, so the comment was not prejudicial in the context of first-prong plain error. The appellate court erred in excusing the

defendant's forfeiture, reversing his conviction, and remanding for a new trial.

¶ 66                                    CONCLUSION

¶ 67         For the reasons that we have stated, we reverse the judgment of the appellate court and affirm the judgment of the circuit court.

¶ 68         Appellate court judgment reversed.

¶ 69         Circuit court judgment affirmed.