2024 IL App (1st) 230817-U

No. 1-23-0817

Order filed December 10, 2024

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 16 CR 5370 |
| DWRIGHT DOTY, | ) ) | Honorable Sophia Atcherson, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The prosecutor's statements during closing arguments did not amount to reversible error.

¶ 2    Following a jury trial, defendant Dwright Doty was found guilty of murder (720 ILCS 5/9-1(a)(1) (West 2016)) and attempted murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2016)), and sentenced to consecutive prison terms of life imprisonment and 30 years' imprisonment,

respectively. On appeal, defendant argues that the prosecutor made improper statements during closing argument. We affirm.

¶ 3    The charges against defendant related to the October 18, 2015, shooting death of Brianna Jenkins and the shooting of Dashari Bowens, as they sat in a vehicle on a Chicago street. The State generally alleged that the shooting was the result of a gang feud between the Terror Dome/Bang Bang Gang (BBG), and the Killa Ward (KW) street gangs, after members of KW killed a BBG member, Tracy Morgan,[1] and injured Tracy's mother. The State alleged that defendant, a BBG member, shot Bowens, a KW member, and Bowens's girlfriend Jenkins, in retaliation for the prior shooting of Tracy and his mother.

¶ 4    Defendant was initially arrested on November 16, 2015, for unlawful possession of a firearm by a felon after a Chicago police detective observed defendant and Tracy's brother, Corey Morgan, leaving a hotel, with defendant carrying a firearm in his waistband. Both defendant and Corey were arrested, and the detective recovered another firearm in a duffle bag carried by Corey.

¶ 5    Thereafter, defendant was charged in the instant case with various offenses relating to the shooting death of Jenkins and the shooting of Bowens. Defendant was also charged in a separate case with the November 2, 2015 shooting death of nine-year old Tyshawn Lee, which was similarly alleged to be a gang related and retaliatory shooting.[2]

---

[1] As Tracy Morgan has the same last name as his brother, Corey Morgan, who was also relevant to the facts of this case, we will refer to them by their first names.

[2] Defendant was ultimately found guilty of the murder of Lee. This court affirmed defendant's conviction and sentence in case number 16 CR 0871502. See *People v. Doty*, 2024 IL App (1st) 200456-U.

¶ 6    Prior to trial, the State filed a motion to admit gang evidence. The trial court ruled that gang evidence would be limited to explaining the circumstances around the instant case, but disallowed the mention of the separate murder case involving Lee.

¶ 7    At trial, Chicago police officer Matthew Kennedy testified as a gang expert about his knowledge of the BBG and the KW street gangs. Officer Kennedy testified that a "fierce rivalry" between BBG and KW was escalated by the October 2015 shooting of Tracy and his mother. Officer Kennedy identified photographs of various members of BBG and KW, including defendant, Tracy, Corey, Bowens, and the individuals who were charged with Tracy's murder. The officer explained various hand signs that the individuals were displaying in the photographs, as well as various tattoos symbolizing gang membership.  Officer Kennedy opined that, based on his experience, he understood defendant, Tracy and Corey to be members of BBG, while Bowens and the individuals charged with Tracy's murder were members of KW.

¶ 8    Bowens testified that he was currently in custody for three felonies pending trial and that he had been previously convicted of a drug possession offense in 2012 and was sentenced to probation. Bowens testified that he had not been made any deals or promises in exchange for his testimony.

¶ 9    Bowens testified that in October 2015, he lived on the 7800 block of South Honore Street in Chicago, and he recently began dating Jenkins. On October 15, 2015, around 4 p.m., Bowens and Jenkins were inside Jenkins's vehicle parked outside of Bowens's home. As Bowens and Jenkins were talking, Bowens heard about 10 gunshots. Bowens could not tell where the gunshots were coming from, but realized that he had been struck on his right side, on his hand and on his ribs.  Bowens saw someone run down the alley, but could not see who the person was.

¶ 10     Bowens looked over at Jenkins and noticed that she was not moving, and was leaning back in her seat. Bowens went to get help, and a neighbor took him to the hospital where he was treated for his injuries over a week and a half. At some point after the shooting, Bowens learned that Jenkins had died.

¶ 11     Several officers testified to the subsequent investigation. That testimony generally established that officers responded to the scene, and observed a vehicle with Jenkins inside, who appeared to be deceased. An evidence technician recovered 11 shell casings from outside the vehicle and 3 fired bullets from inside the vehicle. Officers spoke with witnesses at the scene, but none of the witnesses saw the shooter's face. Officers interviewed Bowen at the hospital, but Bowens also could not identify the shooter.

¶ 12     Dr. Ponni Arunkumar, the chief medical examiner at the Cook County Medical Examiner's Office, testified to the autopsy conducted on Jenkins's body. Dr. Arunkumar testified that Jenkins died due to multiple gunshot wounds and the manner of death was homicide. The parties stipulated that three bullets were recovered from Jenkins's body and taken to the state crime lab for analysis.

¶ 13     Chicago police detective Jefferey Rodenberg testified that on November 16, 2016, he arrested defendant for firearm possession. Rodenberg was conducting surveillance on Corey, Tracy's brother. Rodenberg observed Corey and defendant, with a firearm in his waistband, leaving a hotel. Rodenberg stopped them and recovered defendant's .40-caliber firearm, Corey's cellphone, and a .40-caliber firearm from Corey's duffle bag.

¶ 14     A firearms expert testified that he examined the 11 shell casings and 6 bullets recovered from the scene and from Jenkins's body, as well as the firearm that was recovered from defendant. The firearm expert testified to the process of test firing the weapon to compare the test cartridge

cases and bullets with those that were recovered. Based on that comparison, the firearms expert believed that the firearm recovered from defendant was the same weapon that was used in the offense. On cross-examination, defense counsel noted that the firearm expert had indicated that the comparison showed "similar microscopic patterns," but that he had not indicated that they were "identical." The firearm expert explained that he would not expect the markings to be "identical" because they "will strike or land on an object often having much of the detail damaged" and it would be "rare[ ]" for even the test shots to "match every single item of the individual characteristics."

¶ 15    Retired Chicago police detective Timothy Murphy testified that in January 2016 he was contacted by a jail investigator who said Demetrius Murry, an inmate at the Cook County jail, wanted to share information with the police about defendant. Murry was awaiting sentencing for aggravated discharge of a firearm. After meeting with Murry, Murry's attorney, and an assistant state's attorney (ASA), Murry agreed to wear a recording device and provide information on his conversations with defendant in exchange for the State to "speak favorably at [Murry's] sentencing."

¶ 16    Murphy obtained a judicial overhear order and provided Murry with a recording device, which Murry could turn on and off. Between January 12, 2016, and February 1, 2016, Murphy and Murry met three times to download the recordings, recharge the device, and for Murry to provide any additional information. Murry made 20 to 30 recordings of his conversations with defendant.

¶ 17    The court then issued a limiting instruction regarding gang evidence, explaining that defendant's gang membership could only be used for the issues of motive and identification.

¶ 18    Murry testified that he was currently serving a 10 ½-year prison sentence. Murry was the second highest ranked member of the Sircon City faction of the Gangster Disciples. KW is also a faction of the Gangster Disciples. Murry, however, did not know anyone from KW and stated that all of the Gangster Disciples factions were not aligned. There were no issues between defendant's BBG and Murry's Sircon City.

¶ 19    Murry testified that his first jail conversations with defendant happened between November and December 2015. Murry claimed that in those conversations, which were not recorded, defendant talked about a "brother" and "mama" who had been shot. Defendant held KW responsible for that shooting, and told Murry that he was "going to do something" to "whoever he catches." Murry understood that to mean that defendant would "shoot."

¶ 20    Murry also recalled a conversation where defendant told Murry that he was "riding through some neighborhood" when he saw "some people sitting in a car." Defendant told the person he was with to stay in the car, and that defendant would "take care of this." Defendant then ran up to the vehicle and started "shooting the dude." Defendant told Murry that a girl in the vehicle "start[ed] hollering" and so he "start[ed] shooting her, too." Afterwards, defendant "took off running" back to the vehicle. Defendant told Murry that the girl's name was Brianna.

¶ 21    Murry testified that he told police about his conversations with defendant after Murry was found guilty of aggravated discharge of a firearm. Murry provided the information about defendant because "[m]aybe" the investigator "could help [him] out" for purposes of sentencing. The ASA who made the agreement spoke on Murry's behalf at his sentencing.

¶ 22   The State then published some of the recordings and provided a transcript.[3] In particular, defendant spoke about killing innocent people who were not involved in gangs, and that "if you want to stop killing innocent people, why y'all hiding out?" Murry understood defendant to mean that defendant could not "catch up with" the people who he was "really looking for," because they were hiding. Defendant described Corey as being like his brother. When Murry mentioned that a KW member was upset, defendant responded, "So they feeling that pain that I feel when they shot mom and killed my brother. They had the same feeling I did." Murry understood defendant to mean that the KW member felt the same pain after the shooting of Jenkins and Bowens that defendant felt after Tracy and Tracy's mother were shot. Defendant also discussed how killing people who were uninvolved in gang disputes was contrary to the "rules," but stated that there are "no innocent people."

¶ 23   Defendant further described a woman who he killed, stating "When I killed that b***, I reloaded the motherf***." Defendant described the woman as "lean[ing] back in the car" and stated that he "wouldn't have did her dirty like that. It's just she got to screaming s*** and that s*** made me mad as f***." Murry believed that "wouldn't have did her dirty like that" meant that defendant "wouldn't have shot her up like he did." Defendant then said, "Boom, boom, boom, boom, boom, till my s*** was like click," which Murry understood to mean that defendant kept shooting until the gun was empty. At no point in the recordings did defendant mention Jenkins's name. Murry, however, understood defendant's references to a woman to be about Jenkins.

_____

[3] The court instructed the jury that if there is a perceived conflict between the electronic recording and the transcript, the electronic recording should control.

Additionally, defendant stated that he was "still walking around with the gun" which Murry understood to mean the same firearm used in the offense.

¶ 24    On cross-examination, Murry stated that he had testified for the State in another trial and, in that case, he gave a prior written statement that contradicted his trial testimony. On redirect examination, Murry stated that the current trial differed from the other trial because there are recordings of his conversations with defendant and so Murry "can't change [his] story."

¶ 25    In closing argument, the State generally argued that defendant shot Jenkins and Bowens because he believed KW was responsible for the murder of Tracy and the shooting of Tracy's mother; and that defendant's recorded "confession" to Murry, plus the circumstantial evidence, including his firearm and gang involvement, proved him guilty beyond a reasonable doubt.

¶ 26    Defense counsel argued that the jury should "demand" that the State present "all of the evidence" in this case, but claimed that "the State ha[d] not been forthright." Specifically, defense counsel asserted that the State did not mention Corey who had "all the motive in the world" to avenge his brother's death and mother's shooting. Counsel noted that police had been looking for Corey, and that when he and defendant were arrested, Corey also had a firearm of the same caliber as defendant's firearm. Defense counsel argued, however, that the State was not "bring[ing] it up," despite its "responsibility it is to you as jurors to be forthright, to be honest, to be open with the evidence, because it doesn't fit their narrative."

¶ 27    The State objected and asked for a sidebar. Outside the presence of the jury, the State explained officers were investigating the Tyshawn Lee murder when they tracked Corey and that the State had agreed not to discuss that case at trial. The State asserted that defense counsel's remarks were "putting [the ASA] in a position where [the ASA] can't respond to any of these

things because [the State] didn't put that evidence in because [the State] agreed that [it] wouldn't bring up Tyshawn Lee. This is inappropriate and inadmissible argument."

¶ 28    The court agreed that if the defense was "getting into why" the officers were there, counsel was "getting close to inviting comment about things we said we're not going to talk about." The court stated that the defense could "certainly *** talk about who actually had a familial relationship to the person killed in the Tracy Morgan case," but the defense was "getting close to the line of implying" that there had to be an "explanation about why [the police] were there for *** Corey Morgan," which the court found to be "problematic."

¶ 29    Defense counsel then continued argument in front of the jury, stating:

> "When Detective Rodenberg pulls over that car, Corey Morgan is in the backseat with the duffel bag, with that 40 caliber gun. He's arrested with a 40 caliber gun. The State in their questioning of the detective asked zero questions about Mr. Morgan's 40 caliber, and the reason why they asked no question is, because it didn't fit the narrative. State didn't even ask the caliber, right? You heard a lot of testimony about the 40 caliber and a lot of showing of that 40 caliber that was taken off of [defendant], but do you see a second gun here? Do you see Corey Morgan's 40 caliber? Did you hear the testimony presented by the State whose burden it is to talk about what they did with that gun, the gun held by the brother of the deceased?"

¶ 30    The defense noted that the State sent the firearm that was found on defendant for testing, and that the comparison was "similar," but not identical to the markings on the recovered shell casings and bullets. Defense counsel emphasized that Corey's firearm was the same caliber as the

one that had been tested, and argued, "When you have one 40 caliber and the second one in the hand of the brother who has the motive that is not even mentioned, that is not proof beyond a reasonable doubt." Counsel further argued that it was not the defense's burden, and the defendant "doesn't have to do anything to prove he's innocent."

¶ 31 In rebuttal, the State agreed that the burden of proof always remains on the State, but denied that the State was keeping evidence from, or lying to, the jury. The State asserted that defense counsel could have asked the firearms expert about Corey's firearm but counsel did not. Defense counsel objected; the court overruled the objection. The State then continued,

> "[R]emember, this burden is always on the State and never leaves that table. Never does. But when you're talking about physical evidence in a case like this, we all have access to it. They don't have to prove anything. The burden sits right there, that table with the State of Illinois, but if you think that it was Corey Morgan's gun that was used in that shooting, get it tested."

¶ 32 Defense counsel again objected, and this time the court sustained the objection.

¶ 33 Following deliberations, the jury found defendant guilty of murder and attempted murder. Defendant filed a motion for a new trial, arguing, among other things, that the State "knowingly and repeatedly impermissibly shifted the burden" to the defense during its rebuttal closing argument. The trial court denied defendant's motion, stating, "I believe that the arguments that were made and the rulings on objections were appropriate. One objection was overruled, and one objection was sustained and I believed that those were the appropriate rulings."

¶ 34    Following a sentencing hearing, defendant was sentenced to consecutive terms of natural life in prison for murder and 30 years in prison for attempted murder. Defendant's motion to reconsider sentence was denied.

¶ 35    In this appeal, defendant contends that the prosecutor "committed misconduct during rebuttal closing argument when he shifted the burden of proof to" defendant. Defendant specifically challenges the prosecutor's arguments that the defense could have asked the firearms expert about Corey's firearm and could have tested his firearm, characterizing them as "classic burden shifting."

¶ 36    Closing arguments provide the parties with "a final opportunity before the jury to review the admitted evidence, to explain the relevant law, and to assert why the evidence and the law compel a favorable verdict." *People v. Williams*, 2022 IL 126918, ¶ 40. A prosecutor is allowed wide latitude during closing arguments. *People v. Nieves*, 193 Ill. 2d 513, 532-33 (2000). Remarks made during closing arguments must be examined in the context of those made by both the defense and the prosecution and must always be based upon the evidence presented or reasonable inferences drawn therefrom. *People v. Coleman*, 201 Ill. App. 3d 803, 807 (1990).

¶ 37    The Supreme Court applies a two-step process to determine whether a trial court's decision to overrule a defendant's objection to prosecutorial comment in closing argument is reversible error. A reviewing court must determine whether the comment was improper, and if so, whether the comment was "so prejudicial that real justice was denied or the verdict resulted from the error." *Williams*, 2022 IL 126918, ¶ 41. If the comment "fails to meet either description, it is not reversible error." *Id.* ¶ 49; see also *People v. Jackson*, 2020 IL 124112, ¶ 83.

¶ 38    The parties disagree on the standard of review. Defendant asserts that we review the issue *de novo*. The State asserts we should use an abuse of discretion standard. In *People v. Cook*, 2018 IL App (1st) 142134, ¶¶ 63-64, the reviewing court found both standards of review have been applied separately to appropriate issues on appeal. A reviewing court applies an abuse of discretion standard to determine the propriety of a prosecutor's remarks. *People v. Blue*, 189 Ill. 2d 99, 128 (2000); see also *Williams*, 2022 IL 126918, ¶ 41 ("A trial court's decision to overrule an objection to a comment in prosecutorial closing argument will not be overturned absent an abuse of discretion."). The court reviews *de novo* the legal issue of "whether a prosecutor's misconduct, like improper remarks during argument, was so egregious that it warrants a new trial." *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007).

¶ 39    At the outset, we note that during closing argument, the prosecutor expressly acknowledged that the burden of proof remains with the State. Also, in closing, the defense argued the State was not forthcoming concerning Corey's motive and the firearm that had been found on him, because it did not fit the State's "narrative." The State's comments can reasonably be read as a response to that argument. See *People v. Munson*, 206 Ill. 2d 104, 145 (2002) (a prosecutor may respond to comments made by defense counsel in closing argument that clearly invite a response); see also *Williams*, 2022 IL 126918, ¶ 43 (where the defense argued that the State should have called two witnesses, the State's response that "the defense has subpoena powers just like the government" was not improper).

¶ 40    Even if the State's comments were improper, however, they were not so prejudicial that real justice was denied. The jury was played tape recordings where defendant spoke about being angry about the shooting of Tracy and his mother, and described being the shooter in an incident

similar to the shooting of Jenkins and Bowens. Additionally, a firearms expert believed that the firearm found on defendant was the same one used in the shooting. Based on this evidence, even if the State's comments regarding defendant's ability to test the evidence during closing argument were improper, there is no support for a claim that the jury's verdict resulted from the error.

¶ 41 Defendant nevertheless asserts that he was prejudiced because (1) no eyewitness identified him as the shooter, (2) Murry was a "known liar" with a "motive to frame [defendant] to curry favor with the State" where he received a "benefit" for his testimony by an ASA speaking favorably at Murry's sentencing, (3) the State failed to have its firearm expert analyze Corey's firearm, and (4) the gang expert's testimony was undermined by him not knowing defendant prior to the shooting despite his "familiarity" with other members of the BBGs and KW. These arguments are not well-taken when considered in light of the trial evidence a whole.

¶ 42 Bowens's testimony and the tape recordings of defendant provide a similar account of what happened the day of the shooting. Bowens testified that the shooter fired multiple shots, Jenkins was "leaning back" in the vehicle, and he saw a person run away. In the tape recordings played for the jury, defendant described discharging his firearm at a man and a woman and described the woman as leaning back in the vehicle. Additionally, defendant stated that he was still walking around with the firearm he used, which corroborates the firearm expert's testimony about the firearm recovered from defendant being the same used in the shooting. Moreover, to the extent defendant challenges the credibility of Murry's testimony, we note that his testimony was not used to describe what happened on the day the shooting. Rather, it was used to establish the validity of the recordings which contained defendant's own words.

¶ 43    As for the testimony of the gang and firearms experts, defendant asks this court to reassess the witness's credibility. The jury, however, as fact finder was responsible for those determinations. *Wheeler*, 226 Ill. 2d at 115. The jury found the witnesses credible and decided based on the evidence that defendant was guilty. Because the evidence is not so unreasonable as to justify a reasonable doubt of defendant's guilt, we will not substitute our judgment for that of the jury as the trier of fact on those matters. *Id*. at 114-15. Consequently, defendant's arguments regarding the credibility of Murry and the two experts do not establish that defendant was prejudiced by the prosecutor's remarks.

¶ 44    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 45    Affirmed.