NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240646-U

NO. 4-24-0646

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 19, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | McLean County No. 22CF383 |
| v. | ) ) | |
| | ) | Honorable |
| ALEXANDER THOMAS SEYMOUR, | ) ) | William A. Yoder, Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE VANCIL delivered the judgment of the court.
Presiding Justice Harris and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, finding that although the trial court committed error in its *voir dire* questioning, the error was not prejudicial where the evidence was not closely balanced.

¶ 2    Defendant, Alexander Thomas Seymour, appeals his convictions by jury of

aggravated domestic battery (720 ILCS 5/12-3.3(a-5) (West 2022)) and domestic battery (*id.*

§ 12-3.2(a)(1)). He argues the trial court committed plain error when it failed to question a

potential juror on her understanding and acceptance of the principles contained in Illinois

Supreme Court Rule 431(b) (eff. July 1, 2012). The State concedes the court's failure to question

the juror was error but argues the evidence in this case was not closely balanced, and, therefore,

the error did not prejudice defendant. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On April 20, 2022, defendant was charged by indictment with aggravated domestic battery, a Class 2 felony (720 ILCS 5/12-3.3(a-5) (West 2022)), and by information with domestic battery, a Class A misdemeanor (*id.* § 12-3.2(a)(1)). The charges alleged that on the morning of April 11, 2022, defendant strangled and struck his mother, Paula Seymour, while he was a passenger in her car. The State added an additional charge of aggravated battery (*id.* § 12-3.05(a)(5)) but dismissed it prior to trial.

¶ 5        On September 27, 2023, jury selection began for defendant's trial. In conducting its *voir dire* examination, the trial court made the following statement to the pool of 32 potential jurors:

> "Ladies and gentlemen, the next thing I'm going to do is read you a set of four legal principles. These are called the *Zehr* principles [(see *People v. Zehr*, 103 Ill. 2d 472 (1984))]. Once I read those four principles to you, I'm going to come back to each of you individually and ask whether you understand and accept each of those four legal principles.
>
> ***
>
> Do each of you understand and accept the following legal principles? ***
>
> Number one, that the defendant is presumed innocent of the charges against him.
>
> Number two, that before a defendant can be convicted, the State must prove the defendant guilty beyond a reasonable doubt.
>
> Three, that the defendant is not required to offer any evidence on his own behalf; and
>
> Four, that the defendant's failure to testify cannot be held against him."

The court then addressed 31 of the 32 jurors individually, by name, asking if they understood and accepted the stated principles. Each confirmed that he or she did. The court failed to address this question to one potential juror. This juror was ultimately chosen by the parties to hear defendant's case.

¶ 6          At trial, the State's first witness, Paula Seymour, testified that she was defendant's mother. On the morning of April 11, 2022, she drove defendant and his daughter, A.S., back to the home of A.S.'s mother, Cassandra W., after the two had spent the weekend with her. She planned to drop A.S. at Cassandra's house, where she would catch the bus for school, then drop defendant at the nearby home of his boss, whom he was living with at the time. This would allow Paula to get to work in time for a presentation she had that day. She stated defendant was angry that morning at being made to wake up early and spent the drive to Cassandra's house calling Paula profane names, hitting the back of her seat, and smacking the back of her head from where he sat in the back seat with A.S.

¶ 7          When they arrived at Cassandra's house, defendant exited the vehicle and knocked on the front door. When no one answered, he went to the side of the house to peer in through a window before eventually getting back into the car. Paula stated that he was "very angry" at that point and began yelling, telling her she needed to call Cassandra or go up to the door. Paula suggested she could drop A.S. off at defendant's boss's home with him, but defendant refused, stating it was not his responsibility to get A.S. to school. Paula then put the car into reverse, at which point defendant "kind of just lost it." He "slammed" the car back into park and leaned over the back of Paula's seat to grab for the phone she was using to text her boss to inform him she might be running late. In doing so, he wrapped his right arm around her neck, pinning her head to the headrest. Paula threw the phone away from herself, but defendant kept

- 3 -

his arm around her neck, put his hand on her face to block her nose and mouth, and "just kept squeezing." She testified that she could not breathe and feared she would pass out. She estimated that defendant held her in a "choke hold" for approximately three to four minutes. During this time, she fought back against defendant, hitting him, grabbing his hair, and biting his arm. Eventually, defendant stopped his attack. Paula stated, "He got scared. I remember looking at his face in the mirror, and he was just like holy crap, what did I just do." She testified that at some point during the altercation, she was struck in the jaw by defendant but could not definitively say when.

¶ 8       After the attack, she rolled down her window and began screaming "random things to try to get attention." Defendant exited the car and again knocked on the door to the house. A male resident opened the door and defendant went inside. The male resident then removed defendant's belongings from Paula's car and took A.S. into the house. Paula called the police.

¶ 9       Paula testified that she sustained a swollen neck, a "busted open" lip, and bruises to her face and arms. Photos she took of her injuries immediately after the attack were admitted into evidence. According to Paula, the photos showed swelling and cuts on her lip and dried blood on her chin. When asked what caused these injuries, she answered, "Well, it was either caused by the right arm getting into place underneath my jaw or his left hand covering my face, my mouth, and my nose." She acknowledged they could also have been caused by defendant striking her in the jaw at some point during the altercation. At the request of a police officer, she took additional photos of her injuries three days later. These photos, which, according to Paula, showed bruising on her face, neck, and arms, were also admitted into evidence. Paula added that in addition to the injuries shown in the photos, she lost her voice for several days, her throat was

"sore, scratchy, [and] swollen," and it hurt to move her neck from side to side.

¶ 10 On cross-examination, Paula confirmed that she was only able to see her granddaughter, A.S., when defendant allowed her to. She acknowledged that on the morning in question, defendant told A.S. she would not see Paula anymore, but she denied being upset by it as defendant frequently made this threat. She stated that defendant was upset with the route she took to Cassandra's house and she believed he might have placed a call to 911 on the drive there, but she did not know "if he had made the call or if he just was acting like he was on the call." When asked about biting defendant's arm, she clarified that she had not actually bitten him, only tried to. She stated she had not sought medical attention following the attack but was unable to give her scheduled presentation at work and left early due to not feeling well.

¶ 11 The State's second witness, Officer Alejandro Vasquez, testified that he was a patrol officer who responded to a call on April 11, 2022, concerning a physical domestic violence incident. When he arrived, he spoke to Paula and observed injuries on her body, including a bloody lip and "red marks on her neck." Photos he took of the injuries were admitted into evidence. He identified the photos as showing red marks on Paula's chest and on either side of her neck. He agreed that when he spoke with Paula in person, the marks were "more visible" than they appeared in the photos. He also spoke to defendant that day, whom he stated was "hiding in the basement of the house." The conversation between the two was captured on Officer Vasquez's body-worn camera. A video of the conversation was admitted into evidence.

¶ 12 In the video, defendant, who is handcuffed, tells Officer Vasquez and a second officer that he wants Paula charged with kidnapping because she tried to bite him and tried to "take off with [him] and [his] daughter." He tells the officers that he already tried to call "you guys" on the drive to Cassandra's house because he disagreed with the route Paula took and felt

like he was being "hijacked." He tells the officers a version of events that is initially similar to Paula's version, stating that they arrived at Cassandra's house and were unable to reach anyone inside. Defendant states that when he got back in the car, Paula told him that she would take him to his boss's home and he told her that was not an option. At that point, he reached up to move the car's gear shift back into park, saying, "Just stop for a second." Defendant then tells the officers, "At that point, she grabbed my f*** arm and tried to bite me and I pulled my arm back away from her and she started screaming." He reiterates that she "started screaming bloody murder like I just beat her f*** senseless for some f*** reason." He states that he removed his daughter and their belongings from the car and tried to knock on the back door of the house, which was answered. When Officer Vasquez asks defendant how his mother sustained injuries to her lip, defendant replies, "Honestly, she could have either hit herself, hit the f*** steering wheel, or that could have been whenever she tried to bite my arm and I pulled it away." Defendant denies hiding from the officers, stating that he "was literally just sitting" in the basement of the house smoking a cigarette. When the second officer asks him why he did not come out when he heard officers upstairs, defendant states that he has difficulty moving around police officers because he has posttraumatic stress disorder (PTSD). The video ends with defendant denying hitting Paula in the face or choking her.

¶ 13    The State then rested. Defense counsel moved for a directed verdict, which was denied. Defense counsel rested without presenting evidence.

¶ 14    The jury found defendant guilty of both counts. Defendant did not file a posttrial motion. A sentencing hearing was held on November 30, 2023, at which defendant was sentenced to four years in the Illinois Department of Corrections, followed by four years of mandatory supervised release. He filed a motion to reconsider his sentence, which was denied.

¶ 15          This appeal followed.

¶ 16                              II. ANALYSIS

¶ 17          Defendant argues that the trial court erred in failing to ask one of the jurors whether she understood and accepted the principles enumerated in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). He acknowledges that he forfeited this issue by not raising it during trial or in a subsequent posttrial motion. See *People v. Belknap*, 2014 IL 117094, ¶ 47. Nevertheless, he asks us to review his argument under the first prong of plain error review.

¶ 18          Forfeited errors are reviewable as plain error in the following two situations: (1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales against the defendant and (2) where a clear or obvious error occurred and "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.* ¶ 48. "Whether there is plain error is a question of law, which we review *de novo*." *People v. Williams*, 2022 IL 126918, ¶ 48.

¶ 19                              A. Error

¶ 20          The first step in a plain error analysis is to determine if an error has occurred. *Id.* ¶ 49. Defendant argues the trial court violated Rule 431(b) by failing to ask one of the potential jurors if she understood and accepted the rule's principles. The State concedes the error, and we accept the State's concession.

¶ 21          Rule 431(b) requires a trial court to ask each potential juror whether he or she "understands and accepts" the following four principles: (1) the defendant is presumed innocent of the charges against him, (2) before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt, (3) the defendant is not required to offer any

evidence on his own behalf, and (4) if a defendant does not testify, it cannot be held against him. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). A court may pose these questions to jurors individually or as a group, but regardless of the method of inquiry, each juror must be allowed an opportunity to respond. *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). Our supreme court has held that the language of Rule 431(b) is "clear and unambiguous," requiring a "specific question and response process." *Id.* The question of whether a trial court violated Rule 431(b) is reviewed *de novo*. *People v. Wilmington*, 2013 IL 112938, ¶ 26.

¶ 22        Here, the record shows that the trial court correctly stated all four Rule 431(b) principles together and then went one-by-one to each juror, asking them to state their understanding and acceptance of the principles. Presumably by accident, the court missed one juror in its questioning. As a result, this juror did not partake in the "question and response process" required by Rule 431(b). See *Thompson*, 238 Ill. 2d at 607. We therefore agree with defendant and the State that an error occurred. See *People v. Curry*, 2013 IL App (4th) 120724, ¶ 65 (finding error where the trial court did not give each individual juror an opportunity to confirm his or her understanding of the Rule 431(b) principles).

¶ 23                              B. Closely Balanced Evidence

¶ 24        After determining that an error has occurred, we must next determine if the error requires reversal. *Wilmington*, 2013 IL 112938, ¶ 33. Defendant argues review under only the first prong of plain error. Specifically, he argues that the evidence in his case was closely balanced and, therefore, the error was actually prejudicial, requiring reversal.

¶ 25        "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. "A

reviewing court's inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.* Where the parties' accounts are both plausible and neither is corroborated by extrinsic evidence, the case is closely balanced. *Id.* ¶ 63; *People v. Naylor*, 229 Ill.2d 584, 607-08 (2008). Further, a case may be closely balanced even where a defendant does not offer any evidence. *Williams*, 2022 IL 126918, ¶ 61.

¶ 26          Defendant urges us to find the evidence closely balanced in this case. He argues that because there were no witnesses to the encounter apart from A.S., who did not testify, the case amounted to a credibility contest between defendant and Paula. He acknowledges that the State also presented photos of Paula's injuries but argues that these photos "showed very little in the way of injury and were at least equally consistent with [defendant's] account of events." In fact, defendant argues the photos actually lend stronger support to his version of the incident. Paula contended she suffered a violent attack in which she was punched and strangled, yet defendant argues the photos do not show substantial injuries, contradicting her account. Defendant further notes that Paula did not seek medical care but rather went to work, further weakening the plausibility of her story.

¶ 27          Defendant likens this case to *Naylor*. In *Naylor*, 229 Ill. 2d at 602, the supreme court conducted a plain error analysis concerning the trial court's admittance of evidence of the defendant's prior conviction. After determining the evidence was improperly admitted, the court then discussed whether the evidence in the case was so closely balanced as to require reversal. *Id.* at 605. The court concluded it was, stating that the trial boiled down to a contest of credibility between the conflicting testimony of police officers and the defendant from whom the officers claimed to have purchased heroin. *Id.* at 606-07. The court noted that the testimony of all parties

was credible, specifically stating that the defendant's testimony was consistent with the testimony offered by the officers and the circumstances of his arrest. *Id.* at 607. The court held that, with equally credible accounts and an absence of any extrinsic evidence corroborating either party's version, the evidence was closely balanced. *Id.* at 608-09.

¶ 28   We disagree with defendant's arguments and his reliance on *Naylor*. Here, the parties' accounts of the morning were initially similar. Both agreed that Paula, defendant, and A.S. drove to Cassandra's house on the morning of April 11, 2022. Both agreed that no one answered the door of the home when defendant knocked, that defendant then returned to the vehicle, and that the parties disagreed on the next step to take. Paula contended that when she put the car into drive, defendant slammed the car back into park and reached around her seat with his arms to hold her under her neck in a tight chokehold. Defendant, in his recorded interview with police, asserted that he did not strike or choke Paula but rather that Paula attempted to bite him when he put the car back into park and then proceeded to roll down the windows and scream for seemingly no reason.

¶ 29   If the entirety of the evidence consisted of Paula's testimony and defendant's taped interview, we might agree that the evidence was closely balanced. However, here, unlike in *Naylor*, extrinsic evidence was provided at trial to corroborate Paula's testimony. Specifically, photographs were admitted showing an abrasion on her lip, dried blood on her chin, and redness on the upper part of her chest and, critically, on each side of her neck. These injuries were additionally testified to by Officer Vasquez. Although defendant argues that the injuries shown in the photographs are equally compatible with his version of events, we disagree. Defendant does not explain how Paula attempting to bite him on his right arm when he reached forward to put the car into park, and him then yanking his arm back, would result in redness to both sides of

- 10 -

Paula's neck, as well as her upper chest. Indeed, even if we were to agree with defendant that the injuries shown in the photos are not severe, defendant has offered no explanation for the presence of *any* injuries, even minor, that just so happen to encircle Paula's neck, consistent with her claim of strangulation. In our view, the injuries shown in the admitted photos far more closely align with Paula's assertion that defendant hooked his arm around her neck and choked her. The extrinsic evidence offered by the photos removes this case from the category of "credibility contests" and distinguishes it from *Naylor*, where no extrinsic evidence was offered.

¶ 30          Moreover, unlike the court in *Naylor*, we do not find the defendant's account of events to be credible. Defendant's and Paula's accounts both feature Paula biting defendant, rolling down the windows and screaming, and calling the police. However, while Paula's version of events attributes these actions to the attack she had just experienced, a sequence of events we find plausible, defendant does not offer a similarly credible explanation. According to defendant, Paula simply did these things "for some *** reason." We find this lessens the credibility of defendant's claims. Further, defendant did not have a satisfactory explanation for how Paula sustained the injuries to her face. He first told Officer Vasquez that she could have hit herself or hit the steering wheel, without explaining why or when Paula would have hit herself or how she might have burst open her lip on the steering wheel of her parked car. He then finally suggests that her lip injury could have been caused by her biting him.

¶ 31          His actions after the attack cast further doubt on his credibility. Officer Vasquez testified that he found defendant "hiding" in the basement, and defendant himself admitted that he did not announce his presence when he heard police officers upstairs. Yet according to defendant's account, he had attempted to reach police officers earlier that morning when he felt that he was being "hijacked" by Paula. Even if defendant was not "hiding" from police officers,

we find his failure to respond to their calls puzzling in light of his prior attempt to seek their assistance. To that end, if defendant did not announce himself to police based on his PTSD, as he claims, we are equally confused by his voluntary choice to call them earlier that morning. Either way, we find the inconsistencies in defendant's account, coupled with his lack of a rational explanation for uncontroverted facts, renders his account incredible.

¶ 32      Lastly, we address defendant's argument that because Paula did not seek medical treatment following the attack, her account of the attack lacks credibility. We disagree. Although Paula did not seek medical treatment, her actions after the attack were consistent with her allegations. Paula testified that after the attack, she screamed for help and called the police— facts with which defendant agrees. Further, Paula testified that while she went to work after the attack, she was unable to give her scheduled presentation due to having lost her voice and ended up leaving early because she did not feel well. We therefore do not find Paula's account of the attack to be inconsistent with her actions afterward, despite the fact that she did not seek medical treatment.

¶ 33      To prove defendant guilty of domestic battery, the State needed to prove that he knowingly caused bodily harm to a family member. 720 ILCS 5/12-3.2(a)(1) (West 2022). To prove him guilty of aggravated domestic battery, the State needed to prove he knowingly strangled a family member. *Id.* § 12-3.3(a-5). The contested element in this case was that of bodily harm and strangulation, with Paula asserting that defendant struck and strangled her and defendant claiming he did not. Making a qualitative, commonsense assessment of the evidence presented at trial, we find the evidence in this case strongly favored the State's allegations and was not closely balanced. As such, defendant has not established reversible plain error and cannot overcome the forfeiture of his argument.

¶ 34                              III. CONCLUSION

¶ 35        For the reasons stated, we affirm the trial court's judgment.

¶ 36        Affirmed.