**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 200220-U

Order filed July 24, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0220 Circuit Court No.12-CF-2951 |
| BAHAA A. SAM, | ) ) | Honorable |
| Defendant-Appellant. | ) ) | Amy Bertani-Tomczak, Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Presiding Justice Brennan and Justice Peterson concurred in the judgment.

_____

**ORDER**

¶ 1        Defendant convicted of first-degree murder was entitled to a new trial to determine whether he was insane or guilty but mentally ill at the time of the offense because the prosecutor misstated critical evidence and made several other improper and prejudicial comments that deprived the defendant of a fair trial.

¶ 2        The defendant, Bahaa A. Sam (Sam), was charged with first-degree murder in the beating death of his wife, Nermeen Sam (Nermeen).  Sam admitted to killing Nermeen but argued that he was not guilty by reason of insanity, or, in the alternative, that he was guilty but mentally ill

(GBMI). After a jury trial, Sam was convicted of first-degree murder and sentenced to 29 years' imprisonment.

¶ 3     Sam seeks a new trial, arguing that: (1) the prosecutor committed several improper acts during trial and closing argument that were severely prejudicial to Sam's defense; and (2) the trial court abused its discretion by allowing the State to replay a 40-minute excerpt of a video recording of Sam's initial police interview during its closing argument.

¶ 4                                    I. BACKGROUND

¶ 5     On December 19, 2012, Sam bludgeoned Nermeen to death with a weightlifting bar on the front lawn of the family home in Tinley Park. Jennifer Mazur, a neighbor who lived one block from Sam's residence, drove by the scene at the time of the incident. Mazur testified that she saw Sam repeatedly striking what appeared to be a female child with a pole. A young boy was standing in the yard with Sam. The female was lying face down rolling around on the ground as Sam struck her. The beating occurred on the part of the front yard near the sidewalk, closer to the street than to the house. When Mazur pulled up in front of Sam, Sam stopped beating Nermeen and watched Mazur drive past the scene. Mazur called 911 and reported what she saw.

¶ 6     Mazur drove past the scene again approximately two minutes later. She saw Sam and the boy standing in the same place as before. Sam was staring up at the sky. The female was lying in the same spot where she had been beaten, and was no longer moving. She was not lying under a tree at that time. Her body was not concealed. As Mazur drove by, Sam looked in her direction and appeared to make eye contact with her.

2

¶ 7        Joseph Zambrano testified that he and a few friends drove past the scene that morning and saw a figure lying on the grass covered in blood. The figure was lying closer to the street than the house and was not underneath a tree.  The body was not concealed.

¶ 8        Tinley Park police officer William Batsch was on patrol on the morning the offense was committed and was dispatched to Sam's residence.  When he arrived at the house at approximately noon, other officers were already on the scene. Officer Batsch and the other officers approached the house and knocked loudly on the front door, identifying themselves as police officers. No one answered the door. After entering the house and announcing that they were police officers, Sam emerged from a second-floor room and began walking down the stairs while talking on his cell phone. The officers drew their guns and ordered Sam to stop, but Sam continued walking down the stairs and using his phone.  Sam made eye contact with the officers and spoke softly, making unintelligible statements.  The officers took Sam to the ground, handcuffed him, and placed him in a chair in the front room while some of the other officers searched the house.

¶ 9        Sam was covered in blood from head to toe. While the other officers were searching the house, Sam asked Officer Batsch if Nermeen was alive or if she had passed away. He told Officer Batsch that his wife was under the tree in the front yard, and he asked whether she was moving.

¶ 10        Officer Rudy Rosillo of the Tinley Park Police Department was dispatched to the scene hours later.  When he arrived, Sam was already in custody.  Nermeen's body was partially underneath a pine tree in the yard.  Rosillo transported Sam to the Tinley Park police station. On the way to the station, Sam asked Officer Rosillo whether "she" was dead or still alive.  Sam initially denied killing Nermeen.

¶ 11 When they arrived at the police station, Sam was placed into an interview room where he and Officer Rosillo waited for detectives to come to interview Sam. There was blood spatter all over Sam's face, clothes, hands and feet. He had lacerations on his left thumb and right index finger. Sam and Officer Rosillo waited together for approximately three hours.

¶ 12 During that time, Sam made several statements to Rosillo. At one point Sam said, "she bit me here" and showed Rosillo his right and left thumbs. Sam also asked Officer Rosillo what the date was. When Rosillo told Sam that it was "the 19th," Sam asked whether it was the month of December. At one point, Sam said "it's not good, it's not good, why do like this, why do like this." He told Rosillo that he had four children and asked where they were going to go.

¶ 13 Detectives Stanley Tencza and Osama Dajani arrived and interrogated Sam. The officers mirandized Sam, with Officer Osama Dajani (who spoke Arabic) translating for Sam when necessary. During the interrogation, Sam confessed to killing Nermeen.

¶ 14 During the trial, the State played portions of a video that had been recorded while Sam waited in the interrogation room with Officer Rosillo and while he was interrogated by Detectives Tencza and Dajani. The video lasted approximately one hour, and it included Sam's confession.

¶ 15 During the videotaped interview, Sam gave the following account to the detectives. Sam stated that he and Nermeen lived together and everything was "good." However, he noted that he had been out of work and it had been very hard for him to find a job.

¶ 16 On the morning of the incident, one of Sam and Nermeen's daughters was in the hospital. Sam and Nermeen were home with their four-year-old son, Mina. Nermeen wanted to visit their daughter in the hospital, but Sam told her that she could not go. Sam and Nermeen then began to

4

argue.  Nermeen told Sam that he needed to go find a job. Nermeen accused Sam of sitting in the house all day "like a lady," which challenged Sam's manhood and made him upset.

¶ 17     Sam put his hand up to the wall to prevent Nermeen from leaving the house, and she bit him on his hands and started punching him. Sam said that initially he did not "touch" Nermeen because he was on "one year supervision" from a court for a prior domestic offense and was prohibited from touching Nermeen.

¶ 18     After Nermeen bit Sam, she went outside.  Sam retrieved a weightlifting bar from his office and followed her. Mina followed behind Sam. Sam hit Nermeen once or twice on top of the head with the bar. Sam was scared so he grabbed Mina, ran back inside the house, and lay on the floor. He never went back outside to check on Nermeen and he did not call an ambulance.

¶ 19      Detective Tencza asked Sam how blood got on his clothes, Sam began saying that the blood came from when he struck Nermeen, but then said that the blood came from when Nermeen bit him on his hands. Detective Tencza asked Sam multiple times whether he had moved Nermeen's body underneath the tree after the beating.  Sam denied moving Nermeen's body and stated he did not know how her body got underneath the tree.

¶ 20      Sam asked detectives multiple times during the interrogation whether Nermeen was alive or if she had passed away. After Detective Tencza informed him that Nermeen had passed away, Sam continued to ask detectives whether Nermeen had died. Toward the end of the interview, Sam asked the detectives how Nermeen passed away, and Detective Tencza told him that it was because Sam struck her.

¶ 21     Detective Tencza asked Sam why he was so angered by Nermeen that day.  Sam replied that he had purchased a restaurant two years ago, but his business partner subsequently "kicked him out," and Sam has been unemployed since then.  Sam further stated that Nermeen's mother

did not like him and would fight with him all the time. He believed that she put medication from Egypt in his food to keep him from sleeping. While Sam was employed, there were times when he could not sleep for 24 hours straight.

¶ 22 Illinois State Police Sergeant Heather Poerio, a crime scene investigator, testified that she took photographs of the crime scene and of Sam after he was brought to the police station. It did not appear to her that Sam had attempted to clean up the crime scene or change his bloody clothes after killing Nermeen. Nermeen's body was partially concealed under a pine tree in the yard. There was a bloody, matted-down area of the grass in front of the tree. Seargeant Poerio opined that this suggested that Nermeen's body had been pulled through the grass and placed under the tree.

¶ 23 The defense called Dr. Carl Wahlstrom as an expert in the fields of psychiatry and forensic psychiatry. After examining Sam, reviewing Sam's medical records, and interviewing various witnesses who had knowledge of Sam's mental condition in the months and years prior to the murder, Dr. Wahlstrom opined that Sam was insane at the time of the offense. Dr. Wahlstrom concluded that, at the time of the offense, Sam suffered from severe, major depressive disorder with psychotic features and loss of reality testing. Sam was not being treated at the time of the offense. Dr. Wahlstrom opined that, due to the severity of Sam's mental disorders, Sam lacked a substantial capacity to appreciate the criminality of his conduct. However, Dr. Wahlstrom opined that Sam was fit to stand trial provided he took his medications.

¶ 24 Dr. Wahlstrom testified extensively regarding the interviews he conducted and the medical records he reviewed in forming his medical opinions. The following is a summary of his testimony.

6

¶ 25    From his interviews with Sam's three siblings, Dr. Wahlstrom learned that there had been a drastic change in Sam's behavior in the two years leading up to the offense. Sam had become confused, was not sleeping, stopped bathing, and was losing a lot of weight. Sam would stare at his family, repeat himself, and laugh inappropriately for no reason. He was unable to keep a job, and he believed that his business partners at a restaurant where he had previously worked were stealing from him. He would stay in his bedroom all day and refuse to leave the house. Sam believed that his mother-in-law was poisoning him by putting medicine in his food. Sam's siblings saw no evidence of that.

¶ 26    In early March of 2011, Sam was not sleeping, kept repeating himself, and seemed disoriented and agitated. He went to urgent care and was prescribed Xanax, which did not alleviate his symptoms.

¶ 27    A few days later, Sam's siblings took him to the emergency room at Loyola Hospital (Loyola). According to the Loyola treatment records, Sam said that he felt great and was not depressed. While at Loyola, Sam met with Dr. Matthew Niedzwiecki, a psychiatrist. Dr. Niedzwiecki noted that Sam was mumbling under his breath, "no don't tell them." He indicated that Sam was very distrustful of his coworkers. Dr. Niedzwiecki recommended that Sam discontinue the Xanax and start taking Klonopin, a medication that treats anxiety, panic disorders and psychotic disorders such as bipolar mania and schizophrenia. Dr. Niedzwiecki also recommended that Sam see a psychiatrist.

¶ 28    Two weeks after Sam was examined at Loyola, he began treatment with Dr. Ghassan Aldurra, a psychiatrist at Good Hope Behavioral Help. Sam treated with Dr. Aldurra from March of 2011 through March of 2012. Dr. Wahlstrom reviewed Dr. Aldurra's medical records, which were admitted into evidence. The records indicated that, during Sam's first visit with Dr.

7

Aldurra, Sam was disheveled-looking and appeared to be delusional and severely depressed. Sam would not give his identification to the staff, and he appeared to be paranoid and suspicious. Sam exhibited severely impaired judgment and insight. Dr. Aldurra diagnosed Sam with severe major depressive disorder with psychotic features. Dr. Aldurra prescribed antidepressant and antipsychotic medications. However, Sam did not take the medications. He reported that he did not need the medications because he felt well. Sam was not cooperative with Dr. Aldurra and never wanted to see him. Sam always denied that he was sick.

¶ 29    In April of 2011, Dr. Aldurra noted that Sam appeared delusional. Sam thought that some of the pills in his prescription bottles looked different than the other pills. He believed that both Nermeen and his mother-in law were putting something in his food or changing his medications.

¶ 30    In May and August of 2011, Dr. Aldurra and Sam's brother did notice "some improvement" in Sam's condition. However, Dr. Aldurra continued to prescribe the antidepressant and antipsychotic medications because Sam was still responding to internal stimuli and was still suffering from major depressive disorder with psychotic features. By July of 2011, Dr. Aldurra strongly urged Sam's siblings to take him to a hospital.

¶ 31    By March of 2012, Nermeen reported to Dr. Aldurra that Sam had been "rough" with her and had been hitting her. Based on his review of Sam's medical records up to that point, Dr. Wahlstrom opined that Sam's condition was not being managed and could lead to violent activity.

¶ 32    Dr. Aldurra ultimately decided to stop treating Sam because Sam did not take his medications or comply with Dr. Aldurra's recommendations. Dr. Aldurra warned that things could get worse with Sam.

¶ 33    Dr. Wahlstrom testified that he also reviewed three letters that Sam had obtained from a "Dr. Agaiby" in March and November of 2012. In the letters, Dr. Agaiby claimed that she had been following Sam's condition and that Sam was complying with his medication and improving. However, Sam and his brother told Dr. Wahlstrom that Sam had lied to Dr. Agaiby to get the letters because he needed a doctor to verify that he was taking his medications, which was a condition of Sam's court supervision for a prior act of domestic battery Sam had committed against Nermeen.[1]  The letters appeared to be fabricated.  It did not appear to Dr. Wahlstrom that Dr. Agaiby had evaluated Sam.  Dr. Wahlstrom tried to contact Dr. Agaiby about the letters, but he was unable to because Dr. Agaiby had retained a lawyer prior to Sam's trial who informed Sam's attorney that Dr. Agaiby intended to invoke the Fifth Amendment and would not cooperate in Sam's case.

¶ 34    Dr. Wahlstrom also reviewed a letter that Sam wrote to his family from jail in March of 2013 after his arrest. At that time, Sam was receiving only antidepressant medication, not antipsychotic medication. In his letter, Sam mentioned that "Judas" was poisoning his food, he was not sleeping, and he did not understand what was going on. Dr. Wahlstrom opined that the letter showed that Sam's psychosis was still present at that time.

¶ 35    When Dr. Wahlstrom examined Sam in March of 2014, Sam told him that he had thrown the medication Dr. Aldurra had given him in the garbage.  The medication caused Sam to have tremors in his hands, and Sam did not believe that he needed the medication.

¶ 36    When Dr. Wahlstrom asked Sam if he knew that killing Nermeen was wrong, Sam told Dr. Wahlstrom that he never thought about killing Nermeen and did not know how or why he got

---

[1] Sam committed at least two prior instances of domestic violence against Nermeen.  One occurred in 2005 and the other in June of 2012. Sam pled guilty to battery against Nermeen in the 2012 case and was sentenced to one year of supervision.

the bar or why he killed her. Sam said he did not "feel anything" until after the police came and arrested him.

¶ 37 Sam told Dr. Wahlstrom that he had no memory of ever having moved Nermeen's body after the beating and he only recalled hitting her once or twice. Dr. Wahlstrom testified that a severe psychotic episode could alter one's memory, and the fact that Sam did not remember those things could be indicative of psychosis.

¶ 38 Sam told Dr. Wahlstrom that he had been hearing voices prior to April or May of 2011. Sam said that these voices told him that he was going to lose his business. Sam could not remember whether he heard voices in 2012. Dr. Aldurra's records indicated that Sam was responding to internal stimuli at the time, which could indicate hearing voices.

¶ 39 Dr. Wahlstrom also reviewed Sam's videotaped interrogation with detectives. Dr. Wahlstrom opined that Sam displayed thought-processing disturbance at times during the interview. For example, Sam kept repeating the same question, asking detectives whether Nermeen had passed away even after the detectives told him she was dead.

¶ 40 Dr. Wahlstrom further testified that the fact that Sam was covered in blood and made no attempt to clean himself or to conceal anything after the murder was significant to Dr. Wahlstrom's insanity determination. Also, although Nermeen's body was found underneath a tree, the body was not concealed. Dr. Wahlstrom took this as evidence that Sam was "mentally disorganized" at the time of the offense.

¶ 41 The defense also called Father Yohanna Meshreki, a priest and retired anesthesiologist, who met with Sam more than a year before the offense. Father Meshreki testified that Sam's brother and sister brought Sam to him in April or May of 2011 looking for help. Father Meshreki met with Sam for more than two hours. Sam was unstable and weeping a lot during

10

their conversation. Sam was not communicating well, he kept changing his mind, and he was confused and not composed. Sam's whole life seemed to be in turmoil. He was stressed and was having problems with his wife, his job, and his finances. Father Meshreki worried that Sam could not bear the pressure. It was clear to Father Meshreki that Sam's mind was "not healthy" and that Sam needed the help of a psychiatrist. Father Meshreki prayed with Sam and tried to convince him to seek the help of a psychiatrist. He also informed Sam's brother and sister that Sam needed psychiatric help.

¶ 42    The State called Dr. Randi Zoot, a forensic psychologist, as an expert. Dr. Zoot had worked with criminals in jail and prison settings for more than 30 years. She spent six years leading the mental health unit at Stateville Prison, and was later hired to provide all the fitness and sanity evaluations for the criminal division of the Will County Circuit Court.

¶ 43    Dr. Zoot performed a fitness evaluation of Sam in 2013 and drafted a written report of her evaluation. In preparing her report, Dr. Zoot personally examined Sam and reviewed his medical records, including Dr. Aldurra's records and the Will County Adult Detention Center medical records from December 27, 2012, through the date of Dr. Zoot's examination. She also reviewed all police reports related to the case and to the domestic violence incident in June 2012, among other materials. Dr. Zoot found Sam's mood to be "unremarkable" during the examination. She concluded that Sam suffered from depression, but that he was doing better with medication treatment.

¶ 44    Dr. Zoot stated in her report that Sam had seen a psychiatrist, Dr. Aldurra, from March 2011 through March of 2012, who diagnosed Sam with major affective disorder, single episode severe, and prescribed numerous psychotropic medications. Nermeen expressed concern that Sam was not acting like himself. Sam told Dr. Aldurra that he was fine, he was not suffering

11

from depression, and he did not want to take the prescribed medications. Dr. Aldurra noted early on that Sam appeared to respond to internal stimuli (*i.e.*, hallucinations). Dr. Aldurra prescribed medication, but Sam was not compliant with the medications.

¶ 45    When Dr. Zoot interviewed Sam, he told her that he had been in the United States for 15 years and had a bachelor's degree in education and accounting from Egypt. Sam had worked as a high school teacher in Egypt, but since coming to the United States he had primarily worked as a cook in restaurants until his brother opened a restaurant and put him in charge as the manager. Sam reported that his problems began after his mother-in-law started putting medication into his food to prevent him from sleeping at night. He believed his mother-in-law wanted his business to fail, and he complained to Dr. Aldurra that he was not able to sleep and could not work.

¶ 46    Sam did not want to talk about the murder, but he knew that he was in jail because he killed his wife. When Dr. Zoot asked Sam about his being arrested, he told her that he had not been arrested. Dr. Zoot saw no evidence that Sam was having hallucinations. When she asked Sam about past hallucinations, he neither denied or affirmed that he had experienced them. During her testimony, however, Dr. Zoot acknowledged that Sam might have been experiencing hallucinations during the period he was treating with Dr. Aldurra.

¶ 47    Dr. Zoot concluded that Sam was depressed and that he may have had some psychotic features prior to the offense. However, she opined that there was no connection between Sam's previous psychotic features and the offense. Dr. Zoot concluded that, although Sam may have been depressed and harboring notions about his mother-in-law putting something in his food, there was no way to determine whether the symptoms noted by Dr. Aldurra in March 2012 (and beforehand) were present at the time of the offense.

¶ 48        In October of 2014, Dr. Zoot interviewed Sam a second time to assess his mental state at the time he killed Nermeen. Dr. Zoot authored a second written report detailing her conclusions. In preparing that report, Dr. Zoot again reviewed the police reports and grand jury transcripts in the murder case, the police report from the June 2012 domestic violence incident, the coroner's report, detention facility records, and letters from Dr. Agaiby related to Sam's domestic violence counseling. In addition, Dr. Zoot reviewed medical records from Sam's stay at Loyola, Dr. Aldurra's medical records, and the records of Dr. Jan Stampley, the psychiatrist who interviewed Sam in jail after his arrest. Dr. Zoot also reviewed Dr. Wahlstrom's evaluation and her own records relating to her previous examination and assessment of Sam. Based on her review of these materials and her second interview with Sam, Dr. Zoot opined that Sam was not insane at the time he killed Nermeen.

¶ 49        Dr. Zoot noted that, beginning in March 2011, Sam was diagnosed with insomnia and major affective disorder, single episode severe, after he began showing psychiatric symptoms, as reported by his family. Sam told Dr. Zoot that his mother-in-law was the cause of his mental problems because she was putting things in his food that caused him not to sleep and not to function well. Dr. Zoot noted that, when Sam saw an emergency room physician and a psychiatrist at Loyola, the primary diagnosis was insomnia. There was no mention of psychosis or delusions in the Loyola medical reports at that time.

¶ 50        Dr. Zoot testified that, during her second interview with Sam, Sam initially told her that he and his wife never argued. He said that he and Nermeen "hugged each other," and "talked about everything." Although Sam later acknowledged that he and Nermeen had had arguments and fights, he stressed that they got along well and were in love. Dr. Zoot characterized Sam's initial denial of the arguments with Nermeen as "simply evasive." Dr. Zoot concluded that Sam

13

was trying to give her the impression that there was never any conflict or physical violence between Sam and his wife, and he was trying to evade the notion that he had battered Nermeen in the past.

¶ 51 Dr. Zoot found no evidence that Sam harbored any delusional notions regarding Nermeen or was otherwise delusional on the day he killed Nermeen. Sam repeatedly described his emotions on that day "as being upset and enraged that [Nermeen] was putting him down" by insulting his manhood. Dr. Zoot opined that, although Sam was "certainly depressed and may still have had lingering thoughts about his mother-in-law" at the time he killed Nermeen, "[t]here was never anything to suggest at that time that there was a serious psychosis or anything that was involving [Nermeen] and specific beliefs about her."

¶ 52 Dr. Zoot also reviewed the video of Sam's interview with the police on the day of the offense. She found Sam's behavior during that interview to be "appropriate for the situation and the questions he was being asked." Dr. Zoot did not believe that any of Sam's statements during the interview suggested that Sam was insane. In her view, Sam's account of being scared and lying down on the floor after killing Nermeen merely showed that Sam was aware that he had just killed his wife and was waiting for the police to arrive. Moreover, the fact that Sam did not flee or clean himself up after the killing Nermeen merely indicated that he was overwhelmed and possibly in shock over what had occurred, and he "didn't have much ability to plan beyond that" because the killing was not premedicated. Further, Dr. Zoot concluded that Sam's statements to the detectives that he was going to "lose everything" suggested that he knew his wife was either severely injured or had died as a result of his actions. In addition, Dr. Zoot noted that Sam initially told the detectives that the blood on his clothes was from when Nermeen bit him, which showed lying and deceitfulness.

14

¶ 53    In further support of her opinion that Sam was not insane at the time of the offense, Dr. Zoot relied substantially upon Dr. Stampley's report because Dr. Stampley had interviewed and evaluated Sam in jail two weeks after Sam was arrested. Dr. Zoot noted that Dr. Stampley did not state in his report that Sam was experiencing any delusions or hallucinations at that time. Dr. Zoot found it significant that Dr. Stampley diagnosed Sam as suffering only from a depressive order and did not place Sam in the medical unit or prescribe any antipsychotic medication while Sam was in jail.

¶ 54    Dr. Zoot acknowledged that Sam "did suffer from a serious illness" in that "he was depressed and there had been some psychotic features." However, she opined that Sam's mental illness did not substantially diminish his capacity to understand the wrongfulness and criminality of his conduct. Dr. Zoot found no evidence that any symptoms of psychosis that Sam may have exhibited two years prior to the offense (such as delusions or hallucinations) were present at or near the time of the offense. Accordingly, Dr. Zoot did not believe there was any connection between Sam's killing Nermeen and his earlier psychotic issues.

¶ 55    On cross-examination, Dr. Zoot was asked about the letters that Dr. Agaiby sent to Sam. Dr. Zoot admitted that she had considered the letters in formulating her opinions of Sam's mental state and had placed some reliance on them before she learned that they were unreliable and possibly fabricated. Although she testified that the letters were not a "big part" of what she relied upon in determining Sam's mental state, Dr. Zoot opined that the letters from Dr. Agaiby were significant because they showed that Sam was being deceitful and was "clever" enough to try to keep himself out of trouble with the courts. According to Dr. Zoot, Sam's actions in trying to protect himself and stay out of trouble showed that he was "tracking reasonably well in that area."

15

¶ 56    Dr. Zoot reiterated that, although she did not believe that Sam was insane at the time he killed Nermeen, she did believe he was mentally ill at that time. Sam's counsel asked Dr. Zoot whether this meant that Sam was "afflicted with a substantial disorder of thought, mood or behavior which impaired his judgment." Dr. Zoot responded, "yes."

¶ 57    The State also called Dr. Stampley. Dr. Stampley testified that he met with Sam for 20-25 minutes two weeks after the offense. Sam was alert, oriented to time, place and person, well-kept and well-groomed, and his speech pattern was clear and coherent. Dr. Stampley opined that, although Sam's mood was somewhat depressed and he seemed suspicious and guarded, there was no evidence of psychosis. Sam denied experiencing what Dr. Stampley would consider to be the symptoms of psychosis. Sam told Dr. Stampley that, prior to his arrest, he had been prescribed Risperdal (an antipsychotic medication) and Effexor (an antidepressant), but he had not taken either of these medications for several months prior to his arrest.

¶ 58    Dr. Stampley believed that Sam was suffering from a mental illness that needed to be treated. He diagnosed Sam with depressive disorder and recommended he continue taking the Effexor. He placed Sam in general prison population.

¶ 59    Dr. Stampley testified that it was not his job to determine Sam's state of mind at the time of the offense. Accordingly, Dr. Stampley did not review Sam's prior medical records or any of the police reports.

¶ 60    Sam and Nermeen's daughter Marina, who was 18 at the time of trial, testified as to two prior incidents when Sam had physically abused Nermeen. On June 27, 2012, Marina saw Sam hit, slap, punch, and bite Nermeen during a fight. The police were called and they came to the house after the incident. Marina further testified that, sometime in 2010 or 2011, she saw Sam

16

choking Nermeen with a cable wrapped around her neck. Marina screamed at Sam to stop, which he did.

¶ 61       After the State rested its rebuttal case, the prosecutor informed the court of his intention to replay "most of" Sam's videotaped statement during his closing argument. The prosecutor argued that Sam's "demeanor on that tape is the best evidence of his intent or his mental state." Sam's counsel objected, arguing that replaying of Sam's videotaped statement during closing argument would unduly emphasize that single piece of evidence. Over Sam's counsel's objection, the court allowed the prosecutor to play 40 minutes of the tape during his closing argument.

¶ 62       During his closing argument, the prosecutor contended that Sam killed Nermeen because he was angry, and that the offense had nothing to do with Sam's mental illness. The prosecutor played the selected portion of Sam's videotaped statement and told the jury that it should find Sam guilty of first-degree murder and reject Sam's arguments that he was not guilty by reason of insanity or GBMI.

¶ 63       During his rebuttal closing argument, the prosecutor asserted that Dr. Zoot had testified that Sam's mental illness did not impair his judgment at the time of the offense. Sam's counsel objected, arguing that the prosecutor misstated the evidence. In response to the objection, the court told the jury, "you have heard the evidence. Go ahead."

¶ 64       During his closing argument, Sam's counsel argued that Sam was insane at the time of the offense. In the alternative, he argued that the evidence was sufficient to justify a finding of GBMI because Dr. Zoot, the State's own expert, had agreed that Sam suffered from a mental illness that impaired his judgment at the time of the offense.

17

¶ 65          The jurors received four verdict forms – not guilty of first-degree murder, GBMI, not guilty by reason of insanity, and guilty of first-degree murder. The trial court instructed the jury on the elements of first-degree murder, the insanity defense, and GBMI pursuant to section 6-2 of the Criminal Code (Code) (720 ILCS 5/6-2) (West 2012). The jury instructions stated that a person is insane and not criminally responsible for his conduct if, "at the time of [the] conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2018). The instructions noted that it was the defendant's burden to prove the insanity defense by clear and convincing evidence. 720 ILCS 5/6-2(e) (West 2018).

¶ 66          The instructions further provided that a person may be found guilty but mentally ill and is not relieved of criminal responsibility for his conduct if, at the time of the commission of the offense, he was not insane but was suffering from a mental illness. 720 ILCS 5/6-2(a) (West 2018). The instructions stated that a person is "mentally ill" if, at the time of the commission the offense, he was afflicted by a substantial disorder of thought, mood, or behavior which impaired his judgment, but not to the extent that he was unable to appreciate the wrongfulness of his behavior." 720 ILCS 5/6-2(d) (West 2018).

¶ 67          During its deliberations, the jury sent out a note asking the trial court to "clarify last sentence Mentally Ill - but not to the extent that he was unable to appreciate the wrongfulness of his behavior." On the agreement of the parties, the court responded to the jury's request with a note that stated, "[y]ou have received all of the jury instructions. Please continue to deliberate." The jury found Sam guilty of first-degree murder.

¶ 68          In its post-trial motion, the defense argued that he was entitled to a new trial because 1) the prosecutor had misstated Dr. Zoot's testimony regarding Sam's mental illness, 2) the prosecutor

18

made several other improper and prejudicial comments during opening statements and rebuttal closing arguments, and 3) the trial court erred in allowing the State to replay Sam's videotaped confession in closing argument.

¶ 69    In denying Sam's counsel's motion, the court stated, in pertinent part:

"[The jury] gave careful consideration to all the testimony. They -- I mean they maybe they didn't believe the expert, or maybe the videotaped statement of your client was so compelling on all the issues when it was weighed against any of the expert testimony."

¶ 70    Sam was sentenced to 29 years' imprisonment.

¶ 71    This appeal followed

¶ 72                              II. ANALYSIS

¶ 73                    A.  The Prosecutor's Improper Comments

¶ 74    Sam argues that the prosecutor made several improper comments during trial and closing arguments that deprived him of a fair trial.  Specifically, Sam contends that the prosecutor: 1) misstated critical evidence, 2) misled the jury in various respects, 3) repeatedly expressed his personal opinions, 4) disparaged Sam's defense attorneys, 5) continued to make improper statements and arguments after the trial court had sustained Sam's objections to them, and 6) violated a pre-trial ruling barring the State from referencing the fact that Sam was on supervision for a prior act of domestic battery against Nermeen at the time of the murder.  Sam maintains that he was substantially prejudiced by each of these improper acts, particularly given the closeness of the evidence as to his mental state at the time of the murder.  He asks us to reverse his conviction and remand for a new trial.

19

¶ 75    A defendant has the right to a trial free from improper prejudicial comments or arguments by the prosecutor. *People v. Pasch*, 152 Ill. 2d 133, 184 (1992). A prosecutor is allowed a great deal of latitude in making his closing argument. *Id.* The prosecutor may comment on the evidence and draw any legitimate inferences from the facts in evidence, even if they are unfavorable to the defendant. *People v. Herndon*, 2015 IL App (1st) 123375, ¶ 36. However, a prosecutor must confine his arguments to the evidence and reasonable inferences that can be drawn from the evidence. *People v. Linscott*, 142 Ill. 2d 22 (1991); *People v. McCullom*, 239 Ill. App. 3d 593, 596 (1992). Prosecutors are prohibited from making comments not based upon, or misstating, the evidence. *Linscott*, 142 Ill. 2d 22 (1991); *People v. Starks*, 287 Ill. App. 3d 1035, 1042 (1997).

¶ 76    Improper comments or erroneous statements made by a prosecutor during closing argument warrant reversal if they caused substantial prejudice to the defendant, taking into account the content and context of the improper comments, their relationship to the evidence, and their effect on the defendant's right to a fair and impartial trial. *Herndon*, 2015 IL App (1st) 123375, ¶ 36. Reversal is warranted if the improper remarks constituted a material factor in a defendant's conviction. *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007); *Linscott*, 142 Ill. 2d 22, 28 (1991). If the jury could have reached a contrary verdict had the improper remarks not been made, or if the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted. *Wheeler*, 226 Ill. 2d 92.

¶ 77    In determining whether a trial court's decision to overrule a defendant's objection to a prosecutorial comment in closing argument is reversible error, a reviewing court must engage in a two-step process. *People v. Williams*, 2022 IL 126918, ¶ 41. First, the reviewing court must determine whether the comment was improper. *Id.* If so, the court must then determine whether

20

the improper comment was so prejudicial that real justice was denied or the verdict resulted from the error. *Id.* A trial court's decision to overrule an objection to a comment in prosecutorial closing argument will not be overturned absent an abuse of discretion.

¶ 78                                    1. Misstatement of the Evidence

¶ 79        Sam argues that the prosecutor misstated portions of Dr. Zoot's and Dr. Stampley's testimony addressing Sam's mental illness and need for treatment. Sam maintains that this testimony was critical to the determination of whether he was either insane or GBMI at the time of the offense. We will address Sam's contentions as to each witness in turn.

¶ 80                                              Dr. Zoot

¶ 81        To establish that he was GBMI, Sam needed to prove by a preponderance of the evidence that, at the time of the offense, he was afflicted by a "mental illness," which the statute defines as a "substantial disorder of thought, mood, or behavior *that impaired his judgment*." (Emphasis added.) 720 ILCS 5/6-2(a) (West 2018). During cross-examination, Dr. Zoot essentially conceded that Sam was mentally ill by that definition:

¶ 82        "Q Now, you have agreed that based in your assessment that Mr. Sam was mentally ill at the time of this offense, correct?

¶ 83        A Yes.

¶ 84        Q And being mentally means that he would be afflicted with a substantial disorder of thought, mood or behavior which impaired his judgment, correct?

¶ 85        A Yes." (Emphasis added.)

¶ 86        Nevertheless, during his rebuttal closing argument, the prosecutor erroneously told the jury that Dr. Zoot had *not* made this pivotal concession. Although he acknowledged Dr. Zoot's opinion that Sam suffered from depression at the time of the offense, the prosecutor asserted that

21

"Dr. Zoot *didn't say it impaired his judgment*." (Emphasis added.) Sam's counsel immediately objected, stating that he had "asked Dr. Zoot that specific question including impairment of judgment," and that Dr. Zoot had "answered in the affirmative that that's exactly what her opinion was." In response to this objection, the trial court merely stated to the jury, "[l]adies and gentlemen, you have heard the evidence. Go ahead."

¶ 87 The trial court abused its discretion by failing to grant Sam's counsel's objection. The prosecutor flatly misrepresented Dr. Zoot's opinion testimony as to Sam's mental state at the time of the murder, which was the ultimate issue in the case. By opining that Sam suffered from a substantial mood disorder (depression) that impaired his judgment, Dr. Zoot acknowledged that Sam satisfied the statutory criteria for GBMI. The fact that the State's own expert rendered this opinion was critical and uniquely powerful evidence that, had it not been improperly negated by the prosecutor, might well have convinced the jury that Sam was GBMI.

¶ 88 The prosecutor's complete mischaracterization of Dr. Zoot's opinion was particularly prejudicial because it occurred during the prosecutor's rebuttal argument, leaving Sam's counsel with no opportunity to correct it before the jury began deliberations. *People v. Green*, 209 Ill. App. 3d 233, 245 (1991) ("It is critical, during rebuttal argument, that the prosecuting attorney not make improper arguments or assumptions not based on the evidence since, at that point, the defense is without opportunity to respond."); see also *People v. Escobar*, 77 Ill. App. 3d 169 (1979). The prosecutor's misrepresentation of crucial, potentially dispositive testimony by the State's expert witness as to the issue of GBMI was the last thing the jury heard from the attorneys on that issue.

¶ 89 Dr. Wahlstrom opined that Sam was insane at the time of the offense, and Dr. Zoot opined that Sam had a substantial mood disorder that impaired his judgment at the time. Neither

22

of these opinions supported the jury's verdict. In fact, both opinions, which were the only expert opinions on Sam's mental state presented in the case, strongly suggested that Sam was, at a minimum, GBMI. The evidence to the contrary was not overwhelming. Accordingly, the prosecutor's mischaracterization of Dr. Zoot's testimony was extremely and unfairly prejudicial to the defense.

¶ 90     The trial court's failure to sustain Sam's counsel's objection or to give a limiting instruction lent an air of legitimacy to the prosecutor's characterization of Dr. Zoot's opinion and allowed the jury to conclude that Dr. Zoot's opinion supported the State's case, rather than defense's case, as to one of the ultimate issues presented in the case. It is possible (indeed, likely), that this contributed substantially to the jury's finding that Sam was not GBMI at the time of the murder. This seems even more likely given that the jury asked the trial court to clarify the GBMI instruction during deliberations, suggesting that it was struggling to determine whether the evidence supported a finding of GBMI. The prosecutor's improper misstatement of the crucial evidence on this issue was so prejudicial that real justice was denied. For this reason alone, Sam is entitled to a new trial. *People v. Williams*, 2022 IL 126918, ¶ 41; *Wheeler*, 226 Ill. 2d 92.

¶ 91     The State argues that Dr. Zoot's testimony merely established that Sam had a mental illness in the general sense of the term, not that he had the type of mental illness necessary to support a finding of GBMI. That is not the case. Sam's counsel asked Dr. Zoot questions that tracked the statutory criteria for GBMI word for word. Dr. Zoot agreed that Sam had the exact mental state that the statute defines as GBMI.

¶ 92     The State further argues that Dr. Zoot was "steadfast" throughout her report and testimony that Sam was not *insane* at the time of the murder and was able to appreciate the

23

criminality of his actions. That is a red herring. The relevant issue is whether Sam had the requisite mental state for *GBMI*, not insanity. In the portion of her testimony referenced above, Dr. Zoot clearly indicated that Sam had that mental state.

¶ 93                                    Dr. Stampley

¶ 94          Sam further argues that the prosecutor severely prejudiced his defense by misstating Dr. Stampley's testimony in a critical respect. During his rebuttal closing argument, the prosecutor stated that Dr. Stampley, who interviewed Sam in prison shortly after the offense, concluded that Sam did not need medical treatment. Contrary to the prosecutor's assertion, Dr. Stampley explicitly testified that he believed that Sam "was suffering from a mental illness that *did need to be treated* and then treated appropriately through the use of [antidepressant] medication." (Emphasis added.) Accordingly, Dr. Stampley decided to continue Sam on Effexor.

¶ 95          Sam's counsel immediately objected to the prosecutor's misstatement of Dr. Stampley's testimony. The following exchange took place before the jury:

> State: "Dr. Stampley, again the doctor who interviewed [Sam] closest in time to the offense, stated that [Sam] didn't need mental health treatment. He also stated that the defendant asked him--
>
> Defense: Objection, judge. That's decisively not true. He said he was mentally ill and needed treatment and prescribed medication.
>
> State: I would submit to you that he said—
>
> Court: Hold on. I am going to sustain the objection.

State:  He said he needed mental—I am sorry.  He said he had a mental illness, but he did not say he needed mental treatment.  In fact, he said—

Defense:  Objection, judge.  That's not true.  He did say—The treatment was the medication.  That's what he said.

Court:  I guess we are splitting hairs now.  Let's move on.

¶ 96    The prosecutor's misstatement of Dr. Stampley's testimony was substantially prejudicial to Sam's defense.  Dr. Zoot testified at trial that she had relied heavily on Dr. Stampley's conclusions in formulating her opinion as to Sam's mental state at the time of the offense because Dr. Stampley had evaluated Sam close in time to the offense.  Likewise, the prosecutor repeatedly argued that Dr. Stampley's conclusions were particularly important because Dr. Stampley had evaluated Sam's mental state only two weeks after the offense.  This encouraged the jury to accord substantial weight to Dr. Stampley's testimony.  If the jurors believed that Dr. Stampley had concluded that Sam did not need any mental health treatment, as the prosecutor falsely asserted, this likely contributed to their finding that Sam was neither insane nor GBMI at the time of the offense.

¶ 97    The trial court's response to the Sam's counsel's objections only exacerbated the problem.  After the trial court sustained Sam's counsel's initial objection, the prosecutor persisted with the same improper argument and told the jury a second time that Dr. Stampley "did not say [Sam] needed mental treatment."  When the Sam's counsel objected again, the trial court did not sustain the objection.  Instead, the court trivialized Sam's counsel's objection by characterizing it as "splitting hairs." This effectively removed any salutary effect of the court's prior ruling and suggested that Sam's counsel's objection amounted to nothing more than nit-

25

picking. The trial court's statement conveyed the impression that the prosecutor's characterization of Dr. Stampley's opinion was largely accurate, even if it might have been inaccurate in some irrelevant or insignificant respect. The trial court's failure to sustain Sam's counsel's objection clearly and unequivocally after the prosecutor's repeated misstatement of critical evidence, and its suggestion that the objection was trivial, was an abuse of discretion.

¶ 98     The State argues that any potential prejudice caused by the prosecutor's misstatement was cured because the trial court had sustained Sam's counsel's initial objection and allowed Sam's counsel to inform the jury that 1) the prosecutor's statement was "decisively not true" and 2) Dr. Stampley had concluded that Sam "was mentally ill and needed treatment and prescribed medication." We disagree. As noted, the trial court did not sustain Sam's counsel's second objection, which was made after the prosecutor had repeated his mischaracterization of Dr. Stampley's testimony. Instead, it stated that the Sam's counsel was merely "splitting hairs." Given the importance of Dr. Stampley's testimony as to Sam's need for treatment, the prosecutor's misstatement was highly prejudicial to Sam, and the trial court did nothing to cure or mitigate the harm.

¶ 99     The State further argues that the effect of the prosecutor's misstatement was "negligible at best" because Dr. Stampley's opinion "was not consequential on the issue of [Sam's] mental health." In support of this contention, the State notes that: (1) Dr. Stampley interviewed Sam for only 20 to 25 minutes; (2) the interview was conducted "for the purpose of determining whether [Sam] should remain in the general [prison] population or be moved to the medical unit, not for the purpose of determining his sanity"; and (3) the interview occurred approximately two weeks after the offense, not immediately afterwards.

¶ 100    However, the State took the *exact opposite* position at trial.  At trial, the prosecutor suggested that, among the many mental health professionals who had evaluated Sam before and after the offense, Dr. Stampley's assessment of Sam was the most important since Dr. Stampley had evaluated Sam closest in time to the offense.  In his rebuttal closing argument, the prosecutor again stressed that "[Dr. Stampley] is the doctor that interviewed him closest in time to the date of offense. He didn't interview him nine months, six months, a year earlier. He was within a few weeks of the time of the offense."  As noted, this encouraged the jury to place particular weight on Dr. Stampley's testimony.  Thus, the prosecutor's misrepresentation of Dr. Stampley's testimony likely loomed large in the jurors' minds. Moreover, the fact that the prosecutor's misrepresentation occurred during his rebuttal closing argument only increased its prejudicial effect because it left Sam's counsel with no opportunity to respond.  See *Green*, 209 Ill. App. 3d at 245.

¶ 101    In a further attempt to minimize the impact of the prosecutor's misstatement, the State argues that Dr. Stampley prescribed antidepressant medication only because Sam had asked for it.  The State maintains that Dr. Stampley was merely "acquiescing" to Sam's request to continue taking Effexor.  We find this argument unpersuasive.  The claim that Dr. Stampley would have prescribed medication to a patient simply because the patient wanted it, regardless of whether the medication was necessary or appropriate to treat the patient's diagnosed condition, strains credulity.  In any event, the State's argument is belied by the record.   Dr. Stampley specifically testified that he "thought that [Effexor] was appropriate so [he] decided to prescribe it," and that he "believed that the [Effexor] medication at that time was appropriate."  The State acknowledges these statements in its brief.  The record clearly shows that, in the exercise of his medical judgment, Dr. Stampley concluded that Sam needed mental health treatment, and he

27

prescribed Effexor not because defendant requested it but because Dr. Stampley believed it was an appropriate treatment for Sam's illness.

¶ 102                                  Loyola Medical Center Records

¶ 103          Sam further argues that the prosecutor confused and misled the jury during his closing argument by arguing that the jury could infer Sam's sanity from the fact that health care workers who treated Sam at Loyola Hospital never said that Sam was "insane."

¶ 104          In March of 2011, one-and-a-half years prior to the offense, Sam's sister and brother took Sam to the emergency room at Loyola Hospital and told the hospital staff that Sam was not sleeping, that he was confused and stressed, and that he was repeating himself. Among those who treated Sam at Loyola were Dr. Robert Riggs (the emergency room doctor), Monica Regotti (a nurse), and Dr. Matthew Niedzwiecki (a psychiatrist) (collectively, "the Loyola treaters"). Dr. Wahlstrom relied on the Loyola treaters' medical records in determining Sam's mental state at the time they saw him in March 2011. None of the Loyola treaters used the word "insane" to describe Sam's mental condition.

¶ 105          During his closing argument, the prosecutor urged the jury to infer that Sam was not insane because the word "insane" did not appear in the Loyola treaters' medical records and because Sam did not call any of the Loyola treaters as witnesses to support his argument that he was insane:

> [State]: "He talked about things that Dr. Robert Riggs, M.D., said. States, ready
> to go home, stable for discharge. No words of insanity. Remember the
> defendant kept saying to our doctor, where does it say anger, a-n-g-e-r.
> Well, I don't see i-n-s-a-n-e. I don't see anything about insane. Maybe
> we could have called him. He works at Loyola Hospital right here.

28

How about Monica [Regotti]? She met with the defendant. That was brought out on examination from defense. Yeah. Monica Regotti, about him being nervous and anxious, so forth. We didn't hear anything. She works at Loyola, too, in Chicago.

How about the psychiatrist? I am not going to attempt to pronounce his name, Matthew [Niedzwiecki], medical doctor, psychiatrist. Spoke with the defendant. These were admitted. He is appropriate and linear in his thought form on questioning. If you want to find out somehow that is insane, let's get him here.

¶ 106 Sam's counsel immediately objected, noting that none of the Loyola treaters had evaluated Sam for insanity. The prosecutor responded that his argument was not improper because "they are psychiatrists" and "nowhere does it say anything about being insane." The trial court did not sustain Sam's counsel's objection. Instead, it merely told the jury that "the State and the defense have a right to argue the reasonable inferences. If you don't believe that they are reasonable, feel free to disregard them."

¶ 107 The prosecutor's argument on this issue was improper and misleading. Aside from Drs. Wahlstrom and Zoot, no psychiatrist, medical doctor, or other health care professional evaluated Sam for the purpose of determining whether he was "insane." None of the Loyola treaters opined on that issue. There was no reason for them to do so when they evaluated Sam a year and a half before Sam killed Nermeen. Whether someone is "insane" is a legal question that arises only after a criminal offense has been committed. See *People v. Kando,* 397 Ill. App. 3d 165, 193 (2009). A psychiatric evaluation for "insanity" is conducted for the purpose of determining whether a criminal defendant satisfies the legal definition of insanity, *i.e.* whether the defendant

29

has a mental disease or defect that renders him incapable of appreciating the criminality of his conduct. 720 ILCS 5/6-2 (West 2012). The prosecutor's suggestion that Sam's sanity could be inferred from the fact that the Loyola treaters did not label Sam "insane" in their treatment records was improper and severely prejudicial to Sam. It falsely suggested that medical professionals aside from Dr. Zoot, including a psychiatrist, had reached the conclusion that Sam was sane under the legal definition of the term, which was the ultimate issue in the case.

¶ 108      The trial court's response to Sam's counsel's objection increased the prejudicial impact of the prosecutor's improper argument. The trial court merely told the jury that the parties had the right to argue "reasonable inferences," and that the jury was "free to disregard" arguments or inferences that it did not find to be reasonable. Nothing in the trial court's comment suggested that the prosecutor's argument was improper, that the inference the prosecutor was asking the jurors to draw from the evidence was unreasonable, or that the jurors were *required* to disregard the prosecutor's argument. The trial court took a neutral position and told the jury that it was up to them to decide whether the prosecutor's argument was reasonable and persuasive. Essentially, the trial court overruled Sam's counsel's objection and told the jury that the prosecutor's argument was fair game, thereby aggravating the prejudice to Sam's defense. *People v. Tipton*, 222 Ill. App. 3d 657, 662 (1991) (by overruling Sam's counsel's objection, "the court gave the jury the impression that the prosecutor's remark was proper"); *People v. Kidd*, 147 Ill. 2d 510, 544 (1992) (the trial court "only exacerbate[s] the harm" by overruling counsel's objection to prosecutor's improper remarks). This amounted to an abuse of discretion by the trial court. Contrary to the State's argument on appeal, nothing in the trial court's comments cured or mitigated the prejudicial impact of the prosecutor's improper argument. To the contrary, the trial court only exacerbated the harm.

30

¶ 109     The State further contends that the prosecutor's argument on this issue was proper because Sam "opened the door" by introducing the Loyola treaters' records and using them to support his theory of the case. We disagree. Sam relied upon the Loyola treaters' records (and on Dr. Wahlstrom's opinions as to what those records demonstrated) to establish Sam's mental state in March of 2011. This opened the door for the prosecutor to make arguments about what the Loyola treaters had concluded about Sam's mental state in March 2011, and the relevance of their opinions or diagnoses to Sam's mental state at the time of the offense. However, Sam did not argue that any of the Loyola treaters had stated or concluded that Sam was *insane*. Accordingly, Sam did not open the door for the prosecutor to make misleading arguments and draw invalid inferences from the Loyola treaters' failure to diagnose Sam as insane.

¶ 110     Each of the prosecutor's improper comments discussed above was severely and unfairly prejudicial to Sam's defense. The impact of the improper comments, and the trial courts' failure to redress them effectively, rendered the trial unfair and very likely influenced the jury's verdict. The cumulative nature of the errors only compounded their harm. Sam is therefore entitled to a new trial. Because we find the issues discussed above to be dispositive, we do not need to address Sam's remaining arguments.

¶ 111     There was sufficient evidence from which the jury could have found Sam guilty of first-degree murder beyond a reasonable doubt and, thus, double jeopardy does not preclude a new trial. *People v. McKown*, 236 Ill. 2d 278, 313-14 (2010). However, nothing in this opinion should be construed as a finding regarding Sam's guilt or his mental state that would be binding upon remand.

¶ 112                                   III. CONCLUSION

¶ 113     For the reasons set forth above, we reverse Sam's conviction and remand for a new trial.

31

¶ 114        Reversed and remanded.